**IN THE NORTHERN DISTRICT OF GEORGIA
UNITED STATES DISTRICT COURT
Atlanta Division**

| | | |
|---|---|---|
| DEMOCRATIC PARTY OF GEORGIA, INC., | ) ) ) | Civil Action File No. |
| Plaintiff, | ) ) | _____ |
| v. | ) ) | |
| BRIAN KEMP, in his Official Capacity as the Governor of the State of Georgia, | ) ) ) | **EXPEDITED CONSIDERATION REQUESTED** |
| Defendant. | ) ) ) ) ) ) | |

**VERIFIED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff DEMOCRATIC PARTY OF GEORGIA, INC. files this

constitutional challenge to O.C.G.A. § 21-5-34.2 (the "LC Law") against

Defendant BRIAN KEMP, in his official capacity as the Governor of the State of

Georgia, seeking a declaration that the law violates the First and Fourteenth

Amendments to the United States Constitution.

**INTRODUCTION**

The LC law provides a select few incumbent politicians with the ability to

avoid campaign finance restrictions by establishing and chairing so-called

leadership committees. That framework and process monetizes political cronyism to the benefit of the political allies of the incumbent Governor, Lieutenant Governor, and the leadership of the House and Senate Caucuses, and to the detriment of essentially everyone else: political challengers; anyone who dares to voice an opinion of opposition; anyone who becomes a political enemy of the very few who can raise unlimited campaign dollars; and, of course, the voting public. On its face, O.C.G.A. § 21-5-34.2 violates the constitutional rights of speech and association of Plaintiff, its members, and its constituents, and as such, cannot stand.

### JURISDICTION AND VENUE

1. Plaintiff DEMOCRATIC PARTY OF GEORGIA, INC. brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation of rights, otherwise secured by the United States Constitution, under color of State law.[1]

2. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

3. This Court has personal jurisdiction over Defendant BRIAN KEMP, who is sued in his official capacity only.

---

[1] The Declaration of Tolulope Kevin Olasanoye, the Executive Director of the Democratic Party of Georgia, Inc. verifying this Complaint is attached hereto as Exhibit A.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiff DEMOCRATIC PARTY OF GEORGIA, INC.'s claims occurred in this judicial district.

5. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

6. Defendant BRIAN KEMP ("Kemp" or "Governor Kemp") is the Governor of Georgia. Under Georgia law, the Governor is Georgia's chief law enforcement officer, with the constitutional responsibility to "take care that the laws are faithfully executed." Ga. Const. Art. V § 2.  Those laws include the challenged code section, O.C.G.A. § 21-5-34.2.

7. At all times relevant to this action, Defendant KEMP has acted under color of state law.

8. Plaintiff DEMOCRATIC PARTY OF GEORGIA, INC., ("DPG" or "DEMOCRATIC PARTY") is a state committee, as defined by 52 U.S.C. § 30101(15), and a political party, as defined by O.C.G.A. § 21-2-2(25), dedicated to electing candidates of the Democratic Party to public office throughout the State of Georgia.

## BACKGROUND

### The Georgia Government Transparency and Campaign Finance Act

9.  Historically, contribution limits established by the Georgia Government Transparency and Campaign Finance Act, O.C.G.A. § 21-5-1 *et seq.* (the "Act") applied equally to all candidates and their committees.

10. The Act provides that campaign contributions "shall be utilized only to defray ordinary and necessary expenses" of the campaign, *id.* § 21-5-33(a), which include "expenditures made during the reporting period for qualifying fees, office costs and rent, lodging, equipment, travel, advertising, postage, staff salaries, consultants, files storage, polling, special events, volunteers, reimbursements to volunteers, repayment of any loans received... , contributions to nonprofit organizations, flowers for special occasions, . . . [and] attorney fees connected to and in the furtherance of the campaign." *Id.* § 21-5-3(18).

### The Leadership Committee Law

11. That all changed after the passage of the LC Law, which created an exception to those limitations for leadership committees. Passed along party lines, Governor Brian Kemp signed the legislation into law on March 4, 2021.

12. The LC Law created a new type of political fundraising "committee" that accords a limited number of elected officials – and certain candidates – with

the power to circumvent existing campaign finance restrictions, including regulations as to the maximum amount that a candidate may accept during an election cycle.

13. Significantly, the LC Law also allows those chairing these leadership committees to circumvent the law prohibiting state legislators and the state's constitutional officers from accepting campaign donations while in session, a prohibition aimed at preventing *quid pro quo* corruption or its appearance.

14. Specifically, a leadership committee

> may accept contributions or make expenditures for the purpose of affecting the outcome of any election or advocating of the election or defeat of any candidate, may defray ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office, and may defray ordinary and necessary expenses incurred in connection with a public officer's fulfillment or retention of such office.

O.C.G.A. § 21-5-34.2(d).

15. The LC Law further provides that "the contribution limits [established in the Act. O.C.G.A. § 21-5-41] *shall not apply to contributions to a leadership committee* or *expenditures made by a leadership committee in support of a candidate* . . .." *Id.* § 21-5-34.2(e) (emphasis added).

16. A leadership committee not only may accept unlimited contributions, but it also may make unlimited expenditures benefitting the incumbent chairperson's candidacy (or any candidate of his or her choosing), without

such spending counting as a contribution to the incumbent candidate or his campaign committee. *See id.* § 21-5-34.2(d), (f).

17. The purpose of the LC Law is exactly what one might imagine: to establish "leadership committees" in hopes of winning elections and keeping incumbents in place.  The LC Law provides that a "committee may accept contributions or make expenditures for the purpose of affecting the outcome of any election or advocating for the election or defeat of any candidate, may defray ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office, and may defray ordinary and necessary expenses incurred in connection with a public officer's fulfillment or retention of such office."  O.C.G.A. § 21-5-34.2(d).

18. Moreover, the leadership committee shall not be considered an independent committee, which, while exempt from limits on the amount of campaign contributions, are compelled not to coordinate with candidates, campaign committees, or political action committees. O.C.G.A. §§ 21-5-3(15), 21-5-34.2(f); Ga. Comp. R. & Regs. 189-2-.01(14), 189-6-04.

19. No other candidate for Governor or Lieutenant Governor may chair a leadership committee ***unless and until*** they win a political party's nomination in a primary election. *Id.* § 21-5-34.2(a). Except for the

foregoing exception, no other candidate for statewide office or for the General Assembly not currently in office can chair a leadership committee.

20. As a consequence, challengers and their campaign committees are consigned to unequal capabilities to raise (and thus to spend) funds under the law.

### Protection of Certain Incumbents is Aim of Law

21. Only two statewide constitutional officers are given the power to avoid campaign finance restrictions: the incumbent Governor and Lieutenant Governor.

22. The LC Law permits the incumbent Governor to "chair" a leadership committee that can raise and spend unlimited funds and can coordinate directly with a candidate or a candidate's campaign committee.

23. Almost immediately after the LC Law went into effect in 2021, Defendant KEMP established his leadership committee. That committee exists today and has solicited, collected, and used millions of dollars in campaign contributions free from the restrictions imposed on other elected officials or candidates for statewide office.  Similarly, the LC Law permits the incumbent Lieutenant Governor to "chair" a leadership committee that can raise unlimited funds and can coordinate directly with a candidate or a candidate's campaign committee.

24. During the last gubernatorial election cycle, then Republican candidate for Lieutenant Governor, Burt Jones established a leadership committee named WBJ Leadership Committee. That committee exists today and has solicited, collected, and used millions of dollars in campaign contributions free from the restrictions imposed on other elected officials or candidates for statewide office.

25. The LC Law also gives this power to avoid campaign finance restrictions to the respective legislative caucuses (*i.e.,* Republican and Democratic) in the Georgia House of Representatives and Senate. The leadership of the respective caucuses are allowed to establish up to two leadership committees each, with the only real restriction being that no one person can chair more than one leadership committee at a time.

26. The Republican and Democratic Caucuses in the Georgia House and Senate have all established leadership committees.

27. Significantly, when it comes to elections, the legislative caucuses have a hold and grow policy. That is, they want to hold the seats that their members have already won (*i.e.,* incumbent protection is top priority) and grow their numbers where possible.

28. These legislative leadership committees exist today and have solicited, collected, and used millions of dollars in campaign contributions free from

the restrictions imposed on other elected officials or candidates for legislative office.

29. Other than the incumbent Governor and Lieutenant Governor and the leaders of the respective House and Senate Caucuses, the LC Law does not permit any other elected official or legislative candidate to avoid campaign finance restrictions by establishing a leadership committee.

30. That means that the power to avoid campaign finance restrictions altogether resides in only ten (10) incumbent politicians. The only exception is for an approximate five (5) month period during a gubernatorial election year when the nominees for Governor and Lieutenant Governor are allowed to establish one as well.

31. To wit, the LC Law permits "the nominee of a political party for [Governor and Lieutenant Governor] selected in a primary election in the year in which he or she is nominated" to chair a leadership committee. *Id.* § 21-5-34.2(a).

32. During the last gubernatorial election cycle, the Democratic Party's nominee for Governor and Lieutenant Governor both created a leadership committee.

33. The LC Law, however, requires that the losing candidate(s) transfer or dispose of any remaining assets from that committee and cease using the committee altogether within 60 days of the elections.

34. There is currently no leadership committee in existence with the aim of supporting a Democratic candidate for Governor or Lieutenant Governor in the 2026 cycle; no such leadership committee **can** be established until after the Democratic primary in May of 2026.

35. Other than the major party nominees for Governor and Lieutenant Governor, the LC Law does not permit any other statewide candidate to avoid campaign restrictions by establishing a leadership committee.

## **STANDING**

36. DPG has members and constituents from across Georgia, including:[2]

   a.   individuals who currently hold elected office and face Republican opposition in the upcoming November General Election;

   b.   individuals who have qualified to challenge an incumbent elected official, belonging to their own party or any other; and

   c.   individuals who have qualified for an open seat and have faced and/or will face challengers from their own party or any other, including Republican opposition in the upcoming November General Election.

---

[2]     The Democratic Primary was held on May 21, 2024, and the primary run-off occurred on June 18, 2024. Official status as the Democratic nominee for a particular office does not take place until after the results of the primary and primary runoffs are certified by Georgia's Secretary of State.

37. DPG also has members and constituents from across Georgia, including individuals who wish to donate to individual Democratic candidates directly in excess of the applicable campaign contribution limits or to expend amounts on behalf of an individual Democratic candidate in excess of the applicable campaign contribution limits in coordination with the candidate and that candidate's campaign committee.

38. DPG, in its own right, would like to expend amounts on behalf of an individual Democratic candidate in excess of the applicable campaign contribution limits in coordination with the candidate and that candidate's campaign committee.  Currently, the only way for DPG to expend amounts in excess of the applicable contribution limits is if the expenditure supports a slate of candidates or a group of candidates. *See* O.C.G.A. § 21-5-41(j).

39. Unlike a leadership committee, DPG cannot make an expenditure in excess of the applicable contribution limits to an individual candidate in coordination with the candidate and that candidate's campaign committee.

**FACTUAL ALLEGATIONS ESTABLISHING INJURY-IN-FACT, TRACEABILITY, AND REDRESSABILITY**

40. The harm done by the LC Law is best illustrated by Defendant KEMP's use of his leadership committee, Georgians First Leadership Committee ("GFLEC"), to support other hand-picked Republican candidates.

41. KEMP, through GFLEC, launched an "initiative" intended to put a "bullseye" on the back of specific elected Democratic officials and to aid his Republican allies. The "initiative" is funded by the unlimited contributions that can be raised through GFLEC.

42. KEMP, through GFLEC, named his top Democratic incumbents targets as follows: State Rep. Michelle Au of Johns Creek, State Rep. Farooq Mughal of Dacula, State Rep. Jasmine Clark of Lilburn; State Sen. Nabilah Islam of Lawrenceville; and State Sen. Josh McLaurin of Sandy Springs.

43. KEMP, through GFLEC, has committed to provide, has provided, or will provide ahead of the November General Election, hundreds of thousands of dollars to defeat these five Democratic incumbents – and aid their Republican challengers.

44. Similarly, KEMP, through GFLEC, named his top State House incumbents to protect as follows:  Scott Hilton of Peachtree Corners, Deborah Silcox of Sandy Springs, Matt Reeves of Duluth, Lauren Daniel of Locust Grove,[3] Mike Cheokas of Americus and Gerald Greene of Cuthbert. Each of these Republican incumbents face Democratic challengers.

---

[3]    GFLEC's initiative came up short as to one of Kemp's top incumbents to protect. In the May 2024 primary election Rep. Lauren Daniel was defeated by another Republican candidate.

45. KEMP, through GFLEC, has committed, provided, or will provide ahead of the November general election, hundreds of thousands of dollars to protect the five remaining House Republicans – and defeat their Democratic challengers.

46. The Kemp-backed Republican candidates, bankrolled by KEMP through and in coordination with GFLEC, will be able to expend exponentially more funds than what they could have expended if they were limited to the money raised to their candidate committees.

47. As a result, the Democratic candidates will have to spend more time and resources raising money to compete, but ultimately will not be able to raise and spend as much money ahead of the November General Election as their opposition because they remain subject to campaign contribution limits.

48. The Democratic candidates' injuries are caused by the provisions of the LC Law that include but are not limited to those that establish unequal contribution limits between those that chair LCs and those that do not, and permit leadership committees to coordinate with a candidate of the chair's choosing to expend unlimited amounts on that candidate's behalf with no meaningful restrictions.

49. Defendant KEMP's use of GFLEC to benefit his cadre of Republican allies to the detriment of their Democratic opponents (and some of their Republican opposition as well), who remain subject to the restrictions of Georgia's

campaign finance law, has, is, and will continue to cause an ongoing First
Amendment injury, the ability to express core political speech.

50. The injury is concrete, particularized, and actual; it is not conjectural or
hypothetical.

51. Indeed, KEMP, through GFLEC, announced his very public effort in a press
release, coinciding with a coordinated text and email campaign to raise
unrestricted amounts into GFLEC to support it.[4]

52. The release reads in part:

> **Gov. Kemp's Leadership Committee Highlights Session Accomplishments to Voters, Targets Key Legislative Districts**
>
> **ATLANTA** - Today, Georgians First Leadership Committee announced a six-figure voter contact campaign highlighting Governor Kemp's accomplishments this legislative session working alongside the General Assembly. The campaign will also target competitive legislative districts, thanking Republican members for their support of Governor Kemp's agenda, and educating voters on the far-left positions taken by Georgia Democrats in swing districts.
>
> "GFLC will be sharing those accomplishments with voters, thanking vulnerable Republican members for their strong support, and going on offense against Democrats in the state house and senate who put their far-left agendas ahead of hardworking families in their districts."

---

[4]    *See generally "The Jolt: Kemp deploys political machine for 2024 legislative battle"* Atlanta Journal Constitution, *https://www.ajc.com/politics/politics-blog/the-jolt-kemp-deploys-political-machine-for-2024-legislative-battle/CJUCXRNJKRDAFPF7NAPSU354FM/*

53. As established by the foregoing, DPG has associational standing because its members and constituents, including not limited to those mentioned *supra*, have now secured their respective nominations for office and will stand for election in the November General Election as the Democratic candidate for their respective House or Senate Districts. And, the aim of this Complaint to invalidate an unconstitutional law that impacts core political speech is germane to DPG's organizational mission.[5]

54. Beyond the 2024 November General Election, DPG will have one of its members named as the Democratic Nominee for Governor and the

---

[5]    The Charter of the Democratic Party of Georgia states in part:

> We, the members of the Democratic Party of Georgia, are committed to the establishment of a Party open to all Georgia Democrats. …We are committed to the wisdom and efficacy of the will of the majority; to a belief in the merits of a two-Party system of government which allows for diversity of groups and individuals and to the belief that our party will be strengthened by these differences. We believe in the value of the individual and that government, while protecting life, liberty, and property of individuals, must also be responsive to their collective needs and wills. To this end, we encourage full, timely, and equal opportunity for all segments of the population to participate in party affairs. While pledging ourselves to an honest and open conduct of public affairs befitting the traditions of a people dedicated to a free and just society, we seek to protect and enhance political freedom of all people and to encourage the meaningful participation of all citizens within the framework of the United States Constitution and the laws of the United States and the State of Georgia.

Democratic Nominee for Lieutenant Governor, for the 2026 election cycle. This is not hypothetical. It is fact.

55. That means that in the interim between now and that time, the current incumbent Governor and Lieutenant Governor will continue to be able to raise unlimited amounts of money and spend those amounts without any meaningful restriction in support of their future runs for political office – or their hand-picked replacement.

56. Indeed, Defendant KEMP cannot run for re-election, but he has raised millions of dollars and will continue to raise unrestricted amounts between now and the 2026 Gubernatorial Election. KEMP can simply transfer all those funds to the leadership committee of whomever wins the Republican Gubernatorial Primary. [6]

57. Or, KEMP can transfer the balance of his funds to his federal super PAC[7] Hardworking Americans, Inc. to boost his national profile or to support his

---

[6]     O.C.G.A. § 21-5-34.2(c) provides: "If a person chairing a leadership committee ceases to hold the office…such person shall transfer the remaining assets of the leadership committee, if any, to another leadership committee within 60 days, name an eligible person as the new chairperson of the leadership committee within 60 days, or dispose of the leadership committee's assets as provided by Code Section 21-5-33."

[7]     *See generally* "*Scoop: Brian Kemp launches federal PAC,*" Axios https://www.axios.com/2022/11/27/brian-kemp-federal-pac-georgia (*quoting* Kemp and GFLEC advisor Cody Hall).

reported run against sitting U.S. Senator Jon Ossoff, a Democrat, who will be up for re-election the same year that the Governor's term ends. This again is not hypothetical in that KEMP has already transferred almost $1 million dollars[8] from GFLEC to his federal super PAC since it was formed in February of 2023.

58. Similarly, if the current Lieutenant Governor, who has made no secret of his intention to run for governor in 2026, continues to raise millions into his leadership committee, as soon as he wins the Republican nomination, he can start using those funds immediately in support of his gubernatorial campaign, even though the monies were raised into his Lieutenant Governor leadership committee. In both scenarios, the Democratic Candidate for Governor starts with nothing and has virtually no time to make up a crippling funding difference.

59. As a result of the law creating an asymmetrical campaign contribution scheme, DPG and DPG's members and constituents – whether current or

---

[8]    O.C.G.A. § 21-5-33 (b)(1)(F) provides: "All contributions … in excess of those necessary to defray expenses … and as determined by … such public officer may only be used as follows: …For **transfer without limitation** to one or more **political action committees**." (emphasis added).

future candidates for office – have had and continue to risk having their First Amendment Rights to express core political speech violated.

60. As noted *supra*, one way in which DPG and DPG's members and constituents' First Amendment and Equal Protection rights are harmed by the unequal campaign finance scheme established by § 21-5-34.2 includes Defendant KEMP's use of GFLEC to accept and spend unlimited funds to further whatever Republican candidate that he wants to reward or protect. While at the same time, the Democratic candidates that are running in opposition to those being supported by Defendant KEMP through GFLEC are subject to the campaign finance restrictions that limit both contributions and expenditures made to and on their behalf. *See generally Davis v. Fed. Election Comm'n*, 554 U.S. 724, 729 (2008) (holding that self-financed candidate had standing to challenge law that established asymmetrical contribution scheme between self-financed candidates and their opposition).

## Traceability

61. Here Democratic candidates, running in the same election as the KEMP candidates, have suffered, are suffering, and will continue to suffer an injury in fact caused by KEMP's ability to receive and expend unlimited campaign contributions through his GFLC.

62. The aforementioned injury in fact is traceable to the inequitable scheme which permits KEMP and the other chairs of leadership committees to raise funds not subject to individual contribution limits established by O.C.G.A. § 21-5-41.

### Redressability

63. There is a substantial likelihood that Plaintiff's injury and that of its members and constituents, would be redressed by a favorable decision on the merits.

64. Plaintiff requests that this Court declare Code Section § 21-5-34.2 unconstitutional and enjoin the State from enforcing the law. Such relief would redress the alleged injuries in fact by invalidating the inequitable scheme and ensuring that no candidate can benefit from a leadership committee's ability to accept and expend unlimited amounts of money on their behalf to the detriment of their challengers.

### APPLICABLE LEGAL STANDARD

65. Laws that impose campaign "contribution and expenditure limitations operate in an area of the most fundamental of First Amendment activities." *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976).

66. In *Buckley*, the U.S. Supreme Court established the level of scrutiny that courts must apply when faced with regulations that limit campaign contributions and expenditures.

67. Expenditure limits are to be subjected to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.*, 424 U.S., at 44-45.

68. Under exacting scrutiny, the State may regulate protected speech only if such regulation promotes a compelling interest and is the least restrictive means to further the articulated interest. *See Sable Communications of Cal., Inc.* v. *FCC*, 492 U.S. 115, 126, 109 S. Ct. 2829, 106 L. Ed. 2d 93 (1989).

69. Contribution limits are subjected to a lesser but still "rigorous standard of review," *Buckley* at 29, under which such limits "may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms," *id.*, at 25.

70. Put another way, a law restricting campaign contributions is valid only "if the State demonstrates a sufficiently important interest and the law is closely drawn to serve that state interest." *Ala. Democratic Conf. v. Atty. Gen. of Ala.*, 838 F.3d 1057, 1063 (11th Cir. 2016) (*citing Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (*per curiam*).

71. The purpose of preventing corruption or its appearance is the sole "legitimate and compelling" interest "thus far identified for restricting campaign finances," including limitations on campaign contributions and expenditures. *Ala. Democratic Conf.*, 838 F.3d at 106 (*quoting FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985)).

72. DPG is entitled to equal protection under the law, especially where, as here, uneven and discriminatory treatment burdens its members' First Amendment rights in the throes of a hotly contested political campaign. To justify such unequal treatment, a law must satisfy "greater scrutiny." *See Riddle v. Hickenlooper*, 742 F.3d 922, 927 (10th Cir. 2014).

73. The increased contribution allowance for leadership committees and their concomitant ability to spend those funds with no restriction and in full coordination with one's own campaign, or that of another, serves only to benefit a limited few on one side of a political race and serves no compelling, important, substantial, or legitimate state interest justifying the burden placed by the LC Law on the free exercise of First Amendment rights.

74. Nor is such patent discrimination an appropriately tailored means of advancing any legitimate state interest. It is essentially a modern-day method

to insulate officeholders, and to directly squelch challenges to candidates who are deemed worthy.

75. As such, the LC Law does not come close to satisfying any standard of review.

76. The only legitimate and compelling government interest identified by the United States Supreme Court for restricting campaign contributions is preventing *quid pro quo* corruption or its appearance.

77. Even if the LC Law were supported by a sufficiently important interest, the statute is not closely drawn to achieve it.

78. Rather, it is crafted to allow the incumbent Governor, Lieutenant Governor, and the leadership of the House and Senate Caucuses to obtain a financial advantage against challengers belonging to their own political party or any other.

79. It is crafted to protect certain incumbents (not all) and creates a pay to play political system that is not only repugnant but also unlawful.

80. Enactment of the LC Law cannot be justified by any assertion that it increased Georgia's disclosure reporting requirements. To the contrary, the LC Law simply applied the existing disclosure requirements to the new type of committee. The fact that leadership committees are required to disclose their financial activity does not affect the basic constitutional infirmity

inherent in the law; that is, the LC Law allows certain candidates and incumbents to avoid campaign finance restrictions, but not others. That infirmity that is only exacerbated by the fact that it impacts candidates that are in direct competition with each other.

81. The LC Law also cannot be justified on the grounds that it decreases the risk of *quid pro quo* corruption. The only legitimate and compelling government interests identified by the Supreme Court for restricting campaign finances are preventing *quid pro quo* corruption or its appearance. Indeed, the LC Law expressly exempts leadership committees from the one protection found in existing state law (*e.g.*, O.C.G.A. § 21-5-35(a)) intended to prevent such corruption.

82. A law removing contribution limits for certain incumbents and that allows those same incumbents to expend unlimited amounts to support their own re-election efforts or to support their hand-picked candidates cannot be justified on the grounds that it is an anti-corruption measure.

83. Despite assertions that the LC Law is intended to make political giving more transparent, it fails on that point. First, the fact that the LC Law requires that contributions to a leadership committee be disclosed did not add any further reporting requirement that wasn't already required by existing law. Indeed, it has resulted in less transparency, not more.

84. To be clear, an expenditure made on behalf of an individual candidate and done in coordination with that candidate is considered a contribution under Georgia law and must be reported as such on the candidate's financial disclosures.

85. Leadership committees, however, enjoy an exemption from this reporting requirement. Specifically, the LC Law allows a leadership committee to pay an amount of money to a vendor, for the benefit of an individual candidate, but does not require disclosure on any filings to the Ethics Commission as to the benefitted candidate. Concomitantly, the individual candidate does not have to report an expenditure made by a leadership committee as a contribution to his or her campaign.

86. Notwithstanding the disingenuous reasons given in support of the legislation (*i.e.,* SB 221), the leadership committee scheme is about as transparent as the red clay that this great state is known for. *See generally* Floor speech of Georgia State Senator Jen Jordan in opposition to SB 221 *https://youtu.be/7MJJW-buuaM* (stating that name given to legislation suggesting intent of bill was to provide transparency was incorrect and instead SB 221 should be called "the 'Rules Don't Apply to Us Act,' the 'Incumbency Protection Act,' the 'We Should be Ashamed Act.'")

## <u>CAUSES OF ACTION</u>

### COUNT I
### DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201, 2202

87. Plaintiff realleges and incorporates by reference Paragraphs 1 through 86 of this Complaint as though fully set forth herein.

88. There is an actual controversy in this jurisdiction requiring the Court to declare the rights of Plaintiff and the legal relations between Plaintiff and Defendant regarding the constitutionality of the law that established the asymmetrical campaign finance scheme by authorizing the creations of so-called leadership committees.

89. The Supreme Court has "never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other," and the "unprecedented step of imposing different contribution . . . limits on candidates vying for the same seat is antithetical to the First Amendment." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 738, 743–44 (2008).

90. The First Amendment, as applied to the states by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983, guarantees protection of the freedom of association and the freedom of speech. Included within these protections is the right to participate freely in political activities, without the imposition of unequal campaign finance regulations that favor certain candidates over

others. *See Davis*, 554 U.S. at 737; *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736–40 (2011).

91. Plaintiff, its constituents, and its members have suffered, are suffering, and imminently will continue to suffer irreparable injury as a result of the LC Law's discriminatory restrictions, that allow the chair of a leadership committee to favor one candidate over another vying for the same seat by providing unlimited expenditures on behalf of that candidate, expenditures that are not subject to the individual contribution limits established by O.C.G.A. § 21-5-41, while that candidate's opponent remains subject to those limits. O.C.G.A. § 21-5-34.2(e) ("The contribution limits in Code Section § 21-5-41 shall not apply to contributions to a leadership committee or expenditures made by a leadership committee in support of a candidate or a group of candidates.")

## COUNT II
## VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND 42 U.S.C. § 1983

92. Plaintiff realleges and incorporates by reference Paragraphs 1 through 86 of this Complaint as though fully set forth herein.

93. The First Amendment, as enforced through 42 U.S.C. § 1983, guarantees protections of the freedoms of speech and of association. This includes, *inter alia*, the right to express core political "speech uttered during a campaign for

political office." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 233 (1989).

94. For decades, Georgia had forbidden the acceptance by a candidate or campaign committee of contributions above a certain limit, regardless of whether the candidate was an incumbent or challenger. O.C.G.A. § 21-5-41.

95. The LC Law changed that by providing certain incumbents, including the incumbent Governor and Lieutenant Governor, with the ability to chair a leadership committee, which may accept unlimited contributions and make unlimited expenditures. O.C.G.A. § 21-5-34.2(e).

96. As a result, DPG and its members and constituents, who do not chair a leadership committee, lack the opportunity to promote their respective messages or to exercise their First Amendment rights to the same extent as their adversaries in advance of the November General Election.

97. The LC Law restricts political speech in the form of campaign contributions and expenditures without any demonstrated sufficiently important governmental interest.

98. The LC Law is not closely drawn to serve any sufficiently important State interest.

99. The LC Law's unequal campaign finance scheme violates the free speech and association rights of DPG and its members and constituents.

100.   "Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." *Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001); *see also Ala. Democratic Conf. v. Broussard*, 541 F. App'x 931, 932-33 (11th Cir. 2013) ("It is well-established that political contributions are considered to be political speech, and protected by the First Amendment.").

101.   The LC Law has caused, will continue to cause, and imminently threatens to cause Plaintiff – and specifically Plaintiff's members and constituents – irreparable injury by denying Democratic candidates the ability to raise campaign funds used to engage in core political speech and association. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

102.   Indeed, "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu*, 489 U.S. at 223 (internal punctuation and citations omitted).

103.   While the legislature does have the power to pass laws to protect against corruption or even the appearance thereof, a legislative body cannot regulate contributions to "restrict the political participation of some in order to

enhance the relative influence of others." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014).

104.    The only interest the LC Law serves is incumbent protection for select incumbents. But that interest has "ominous implications," as it would allow the government "to arrogate the voters' authority to evaluate the strengths of candidates competing for office." *Davis*, 554 U.S. at 742. By enacting a campaign finance law that not only works to protect a handful of powerful incumbents but also gives those incumbents the power to pick winners and losers (by using their leadership committees to pour unlimited funds into the campaigns of their chosen candidates), the State not only makes a judgment as to who is worthy of election but empowers the LC chairs to do the same. "The Constitution, however, confers upon voters" the power to choose their representatives, not the state, and "it is a dangerous business" for Georgia "to use the election laws to influence the voters' choices." *Id.*

**COUNT III**
**VIOLATION OF FOURTEENTH AMENDMENT TO THE U.S.**
**CONSTITUTION AND 42 U.S.C. § 1983**

105.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 86 of this Complaint as though fully set forth herein.

106.   Under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983, DPG and its members and constituents have the right to enjoy the equal protection of the law, especially where, as here, unequal treatment under the law burdens the exercise of the fundamental right to free speech under the First Amendment.

107.   Whether we are talking about statewide constitutional offices or legislative ones, incumbent candidates and those challenging them, whether they are of the same political party or of another, are similarly-situated.

108.   There is no legitimate governmental interest, let alone a sufficiently important interest, that justifies the LC Law's discriminatory distribution of benefits based solely on the incumbent status of a limited few that is intended to disadvantage challengers and protect those already in office.

109.   The LC Law restricts political speech in the form of campaign contributions and expenditures without any demonstrated sufficiently important governmental interest.

110.   The LC Law is not closely drawn to serve any sufficiently important State interest.

111.    On its face, the LC Law abridges Plaintiff's rights to free speech and

association and those of its members and constituents under the First and

Fourteenth Amendments to the United States Constitution and under 42

U.S.C. § 1983.

112.    The LC Law treats certain incumbent candidates unequally with respect

to contribution and expenditure limitations, based solely on their status as

one of a handful of incumbent officeholders imbued with the power to chair a

leadership committee. This unequal treatment gives these incumbents a

significant competitive advantage over other candidates who have declared,

qualified, and ran for the same office.  And gives these incumbents the

power to give their chosen candidates a significant competitive advantage

over their opposition.

113.    Put another way, DPG's members and constituents who deign to

challenge the chair of a leadership committee or challenge the preferred

candidate of the chair of a leadership committee, are handcuffed from

competing on equal footing with their main opponent, whether that opponent

is a member of the same political party or another.

114.    An incumbent candidate and challenger candidates are similarly situated

as candidates for office. Yet, the LC Law treats incumbent leadership chairs

unequally with respect to contribution and expenditure limitations, based

solely on his or her status as an incumbent allowed to chair a leadership committee under the law.

115.   This unequal treatment gives incumbent candidates who chair leadership committees a significant competitive advantage over other candidates running in the same election or over other candidates that are running against the preferred candidate of a chair of a leadership committee. There is no compelling, important, substantial, or legitimate state interest that justifies such patent discrimination against these challenger candidates.

116.   There is no compelling, important, substantial, or legitimate state interest that justifies the LC Law's discriminatory distribution of benefits and disadvantages based solely on a candidate's status as an incumbent who chairs a leadership committee versus a challenger that does not. Nor is such discrimination a least restrictive, narrowly tailored, direct, proportionate, or rational means of advancing any legitimate state interest.

117.   On its face, the LC Law's uneven and discriminatory contribution limits violate DPG's right to equal protection of the law under the Fourteenth Amendment and 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks this Court:

A. To issue preliminary and permanent injunctive relief to enjoin Defendant, his employees, agents, and successors in office from enforcing O.C.G.A. § 21-5-34.2.

B. To enter a judgment declaring that O.C.G.A. § 21-5-34.2 violates the First and Fourteenth Amendments to the United States Constitution.

C. To award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

D. To grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED, this 18th day of July 2024.

/s/Jennifer Auer Jordan
JENNIFER AUER JORDAN
Georgia Bar No. 027857
DARREN SUMMERVILLE
Georgia Bar No. 691978
KRIS ALDERMAN
Georgia Bar No. 179645
ELIZABETH STONE
Georgia Bar No. 684098

THE SUMMERVILLE FIRM, LLC
1226 Ponce de Leon Avenue, NE
Atlanta, GA 30306
T: 770.635.0030
F: 770.635.0029