## IN THE NORTHERN DISTRICT OF GEORGIA
## UNITED STATES DISTRICT COURT
### Atlanta Division

| | |
|---|---|
| DEMOCRATIC PARTY OF GEORGIA, INC., )<br><br>     Plaintiff, )<br><br>     v. )<br><br>BRIAN KEMP, in his Official Capacity as the Governor of the State of Georgia, )<br><br>     Defendant. ) | Civil Action File No.<br><br>_____<br><br><br>**EXPEDITED CONSIDERATION REQUESTED** |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff DEMOCRATIC PARTY OF GEORGIA, INC. moves this Court for preliminary injunctive relief prohibiting the State of Georgia from enforcing O.C.G.A. § 21-5-34.2 (the "LC Law") because it violates the First and Fourteenth Amendments to the United States Constitution.

## INTRODUCTION

A fundamental tenet and underpinning of democracy is that elections should be fair and evenhanded. Another is that those who seek to represent and lead in offices of public service should start out on an even playing field. The LC Law contravenes both of those notions, and in rather obvious fashion.

The LC Law provides a select few incumbent politicians with the ability to avoid campaign finance restrictions by establishing and chairing so-called leadership committees. That framework and process monetizes political cronyism to the benefit of the political allies of the incumbent Governor, Lieutenant Governor, and the leadership of the House and Senate Caucuses, and to the detriment of essentially everyone else: political challengers; anyone who dares to voice an opinion of opposition; anyone who becomes a political enemy of the very few who can raise unlimited campaign dollars; and, of course, the voting public. On its face, O.C.G.A. § 21-5-34.2 violates the constitutional rights of speech and association of Plaintiff, its members, and its constituents, and as such, cannot stand.

## BACKGROUND OF THE LEADERSHIP COMMITTEE LAW

Prior to 2021, the Georgia Government Transparency and Campaign Finance Act (the "Act"), O.C.G.A. §§ 21-5-1, *et seq.*, imposed campaign contribution limits equally on all statewide candidates. O.C.G.A. § 21-5-41(a). Similarly, the Act imposed campaign contribution limits equally on all candidates for the General Assembly. *Id.* § 21-5-41(b). That all changed after the passage of the O.C.G.A. § 21-5-34.2 ("LC Law"), which created a one-sided exception to those contribution limits. Passed along party lines, Governor Brian Kemp signed the legislation into law on March 4, 2021. The LC Law created a new type of political fundraising "committee" that accords a limited number of elected officials – and certain candidates – with the

power to circumvent existing campaign finance restrictions, including regulations as to the maximum amount that a candidate may accept during an election cycle. Significantly, the LC Law also allows those chairing these leadership committees to circumvent the law prohibiting state legislators and the state's constitutional officers from accepting campaign donations during the legislative session, a prohibition aimed at preventing *quid pro quo* corruption or the appearance thereof.

Specifically, a leadership committee

> may accept contributions or make expenditures for the purpose of affecting the outcome of any election or advocating of the election or defeat of any candidate, may defray ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office, and may defray ordinary and necessary expenses incurred in connection with a public officer's fulfillment or retention of such office.

O.C.G.A. § 21-5-34.2(d).

The LC Law further provides that "the contribution limits [established in the Act. O.C.G.A. § 21-5-41] shall not apply to contributions to a leadership committee or expenditures made by a leadership committee in support of a candidate . . .." *Id.* § 21-5-34.2(e). A leadership committee not only can accept unlimited contributions and use those funds to support the leadership committee's chair, but it can also use those unlimited contributions to make unlimited expenditures benefitting **any** candidate of the chair's choosing. *Id.* § 21-5-34.2(d).

As to the latter, the LC Law provides that a leadership committee shall not be considered an independent committee. This worked a significant change to

3

existing law in that while independent committees were exempt from contribution limits, they could not **coordinate** with candidates, campaign committees, or political action committees. O.C.G.A. §§ 21-5-3(15), 21-5-34.2(f); Ga. Comp. R. & Regs. 189-2-.01(14), 189-6-04.  So essentially, the LC Law not only created a new type of fundraising committee exempt from contribution limits – that can only be chaired by a select few incumbents – but also failed to guard against the "threat of *quid pro quo* corruption" with any sort of embedded anti-coordination restriction [1]

The power to chair a leadership committee is given to a limited number of incumbent office holders that include Governor, Lieutenant Governor, two Republican members of the House Republican Caucus, two Democratic members of the House Democratic Caucus, two Republican members of the Senate Republican Caucus, and two Democratic members of the Senate Democratic Caucus. Other than the incumbent Governor and Lieutenant Governor and the leaders of the respective House and Senate Caucuses, the LC Law does not permit

---

[1]     The U.S. Supreme Court in *Citizens United* held that federal election law violated the First Amendment by restricting independent political spending. The holding allowed corporate entities to make unlimited independent expenditures supporting or opposing issues or candidates as long as the expenditures **were not coordinated** with a candidate. *Citizens United v. FEC*, 558 U.S. 310 (2010). At issue was whether **independent speech** is the type that poses a risk of *quid pro quo* corruption or the appearance thereof. *Id.* at 360. The Court determined that speech through independent expenditures does not pose such a risk— coordination breaks the essential independence of the expenditure and has always been deemed the functional equivalent of a candidate contribution. *Id*.

any other elected official or legislative candidate to avoid campaign finance restrictions by establishing a leadership committee. That means that the power to avoid campaign finance restrictions altogether resides in only ten incumbents.

The only exception is for an approximate five-month period during a gubernatorial election year when the nominees for Governor and Lieutenant Governor are allowed to establish one as well. Specifically, the LC Law permits "the nominee of a political party for [Governor and Lieutenant Governor] selected in a primary election in the year in which he or she is nominated" to chair a leadership committee. *Id.* § 21-5-34.2(a). However, these candidates for Governor and Lieutenant Governor cannot chair a leadership committee **unless and until** they win a political party's nomination in a primary election. *Id.* § 21-5-34.2(a). Consequently, any challenger to an incumbent Governor or Lieutenant Governor and their campaign is consigned to unequal capabilities to raise (and thus to spend) funds under the LC Law.

During the last gubernatorial election cycle, the Democratic Party's nominee for Governor and Lieutenant Governor both created a leadership committee. The LC Law, however, requires that the losing candidate(s) transfer or dispose of any remaining assets from that committee and cease using the committee altogether within 60 days of the elections. There is currently no leadership committee in existence with the aim of supporting a Democratic candidate for Governor or

Lieutenant Governor in the 2026 cycle; no such leadership committee can be established until after the Democratic primary in May of 2026.

### FACTUAL ALLEGATIONS ESTABLISHING INJURY-IN-FACT, TRACEABILITY, AND REDRESSABILITY[2]

Almost immediately after signing SB 221 into law, Defendant KEMP formed his leadership committee, Georgians First Leadership Committee, Inc. ("GFLEC")

In terms of this Motion seeking preliminary relief, the immediate and ongoing harm done by the LC Law is best illustrated by Defendant KEMP's use of his leadership committee, Georgians First Leadership Committee, Inc., to support other hand-picked Republican candidates ahead of the November 5, 2024, General Election ("November General Election"). KEMP, through GFLEC, launched an "initiative" intended to put a "bullseye" on the back of specific elected Democratic officials and to aid his Republican allies. The "initiative" is funded by the unlimited contributions that can be raised through GFLEC. KEMP, through

---

[2]    DPG addresses these specific elements to establish its Article III standing. As this Court knows, Article III of the United States Constitution expressly limits federal jurisdiction to "cases and controversies" and does not permit federal courts to issue advisory opinions. *Miller v. F.C.C.*, 66 F.3d 1140, 1145 (11th Cir. 1995), "To have a case or controversy, a litigant must establish that he [or she] has standing," United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019), which requires the litigant to show (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

GFLEC, named his top Democratic incumbents targets as follows: State Rep. Michelle Au of Johns Creek, State Rep. Farooq Mughal of Dacula, State Rep. Jasmine Clark of Lilburn; State Sen. Nabilah Islam of Lawrenceville; and State Sen. Josh McLaurin of Sandy Springs. KEMP, through GFLEC, has committed to provide, has provided, or will provide ahead of the November General Election, hundreds of thousands of dollars to defeat these five Democratic incumbents – and aid their Republican challengers. Similarly, KEMP, through GFLEC, named his top State House incumbents to protect as follows:  Scott Hilton of Peachtree Corners, Deborah Silcox of Sandy Springs, Matt Reeves of Duluth, Lauren Daniel of Locust Grove,[3] Mike Cheokas of Americus and Gerald Greene of Cuthbert. Each of these Republican incumbents face Democratic challengers. KEMP, through GFLEC, has committed, provided, or will provide ahead of the November general election, hundreds of thousands of dollars to protect the five remaining House Republicans – and defeat their Democratic challengers. The Kemp-backed Republican candidates, bankrolled by KEMP through and in coordination with GFLEC, will be able to expend exponentially more funds than what they could have expended if they were limited to the money raised to their candidate committees.

---

[3]     GFLEC's initiative came up short as to one of Kemp's top incumbents to protect. In the May 2024 primary election Rep. Lauren Daniel was defeated by another Republican candidate.

As a result, the Democratic candidates and DPG will have to spend more time and resources raising money to compete, but ultimately will not be able to raise and spend as much money ahead of the November General Election as their opposition because they remain subject to campaign contribution limits. The Democratic candidates' injuries are caused by the provisions of the LC Law that include but are not limited to those that establish **unequal** contribution limits between those that chair LCs and those that do not, and permit leadership committees to **coordinate** with a candidate of the chair's choosing to expend unlimited amounts on that candidate's behalf with no meaningful restrictions.

Defendant KEMP's use of GFLEC to benefit his cadre of Republican allies to the detriment of their Democratic opponents (and some of their Republican opposition as well), who remain subject to the restrictions of Georgia's campaign finance law, has, is, and will continue to cause an ongoing First Amendment injury, the ability to express core political speech. The injury is concrete, particularized, and actual; it is not conjectural or hypothetical.

As established by the foregoing, DPG has standing, in its own right, and associational standing because its members and constituents, including not limited to those mentioned already, have now secured their respective nominations for office and will stand for election in the November General Election as the Democratic candidate for their respective House or Senate Districts.

8

**Traceability**

The now official Democratic candidates, running in the same election as the KEMP candidates, have suffered, are suffering, and will continue to suffer an injury in fact caused by KEMP's ability to receive and expend unlimited campaign contributions through his GFLC. The aforementioned injury in fact is traceable to the inequitable framework (and altogether obvious plan) which permits KEMP and the other chairs of leadership committees to raise funds not subject to individual contribution limits established by O.C.G.A. § 21-5-41.

**Redressability**

There is a substantial likelihood that DPG's injury and that of its members and constituents, would be redressed by a favorable decision on the merits. DPG requests that this Court declare Code Section § 21-5-34.2 unconstitutional and enjoin the State from enforcing the law. Such relief would redress the alleged injuries in fact by invalidating the inequitable funding framework and scheme and ensuring that no candidate can benefit from a leadership committee's ability to accept and expend unlimited amounts of money on their behalf to the detriment of their challengers.

In sum, the unconstitutional LC Law has allowed KEMP and GFLEC to spend millions to support candidates that KEMP favors using funds raised in unlimited amounts as permitted by the LC Law, while the Democratic challengers

to those favored candidates are subject to campaign limits. Indeed, the LC Law restrains targeted Democratic candidates from fighting back on equal terms because contributions from their supporters remain subject to the strict statutory contribution limits that apply to everyone else but for chairs of leadership committees. Per their public statements, KEMP through GFLEC can be expected to continue raising spending hundreds of thousands—if not millions—of dollars more as we approach the November General Election – necessitating the preliminary injunctive relief requested by DPG.

## ARGUMENT

In order to obtain a preliminary injunction, Plaintiff DPG must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that granting the relief would not be adverse to the public interest. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010); *Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1223, 1225-26 (11th Cir. 2005). Because Plaintiff DPG can demonstrate all four of the prerequisites, this Court should grant preliminary injunctive relief.  Analysis of each prong follows.

(1) **Plaintiff DPG will Succeed on the Merits**[4]

    (a) **The Leadership Committee Law Violates Plaintiff's First Amendment Rights**

The First Amendment, incorporated through the Fourteenth Amendment, prohibits the State from "abridging the freedom of speech." U.S. Const. amend. I. "Above 'all else, the First Amendment means that government' generally 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Barr v. Am. Assn. of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011) (internal quotation marks omitted).

---

[4]    This Court has addressed the constitutionality of the LC Law on three separate occasions. In *Perdue v. Kemp*, the Court found that the State's proffered interest in "transparency" was "not a sufficient legal justification for the 'unprecedented step of imposing different contribution ... limits on candidates vying for the same seat[.]'" *Perdue v. Kemp*, 584 F. Supp. 3d 1310 (N.D. Ga. Feb. 7, 2022).

    The Court also found no evidence to support the proposition that the State's interest in enacting the LC Law was the prevention of *quid pro quo* corruption or the appearance thereof, which is the only recognized state interest sufficiently legitimate to justify such a regulation. *Id.* The Court further found that even if there was a legitimate government interest, the LC Law was not closely drawn to achieve it. *Id.*

    The Court applied the same reasoning in *One Georgia, Inc. v. Carr*, 601 F. Supp. 3d 1291 (N.D. Ga. Apr. 28, 2022) and in *Graham v. Carr*, 634 F. Supp. 3d 1343, 1355 (N.D. Ga. October 6, 2022). Logic is empirical and universal; there is no reason to abandon it, here.

A "major purpose of the First Amendment was to protect the free discussion of governmental affairs" especially of candidates and their beliefs and performance. *Id*. at 2828. And as the Supreme Court explained in its seminal campaign regulation decision, *Buckley v. Valeo*, 424 U.S. 1 (1976) (*per curiam*), political speech is the lifeblood of democracy and limitations on contributions implicate core First Amendment rights. *See Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299 (1981) ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression.").

In the Eleventh Circuit, a law limiting political contributions "is valid 'if the State demonstrates a sufficiently important interest' and the law is 'closely drawn' to serve that state interest, even if there is a 'significant interference' with political association." *Ala. Democratic Conf. v. Att'y Gen. of Ala.*, 838 F.3d 1057, 1063 (11th Cir. 2016) (quoting *Buckley*, 424 U.S. at 25). This standard is a "lesser demand" than strict scrutiny. *Id.* (citing *Beaumont*, 539 U.S. at 155).

In "election related settings," the Supreme Court often applies "exacting scrutiny." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021). *But see McConnell v. FEC*, 540 U.S. 93, 266 (2003) (Thomas, J., concurring) ("[C]ampaign finance laws are subject to strict scrutiny." (citation omitted)). Under that standard, a burden on a candidate's speech "cannot stand unless it is 'justified by a compelling state interest.'" *Davis*, 554 U.S. at 740; *see also Ariz. Free Enter.*

*Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736–40 (2011). Furthermore,

the restriction must "be narrowly tailored to the interest it promotes." *Ams. for*

*Prosperity Found.*, 141 S. Ct. at 2385; *see, e.g.*, *Randall v. Sorrell*, 548 U.S. 230,

261 (2006) (plurality) (holding contribution limits "not narrowly tailored"); *FEC v.*

*Mass. Citizens for Life, Inc.*, 479 U.S. 238, 261 (1986) (similar).

Whether the Court applies strict or exacting scrutiny or some "lesser

demand," the LC Law fails because it severely burdens DPG's First Amendment

rights and is not closely drawn to advance a sufficiently important much less

compelling state interest that justifies the burden that it imposes on First

Amendment rights.[5]

### (b) The LC Law Severely Burdens Plaintiff's First Amendment Rights

---

[5] While on its face, the law seems to simply exempt certain persons from the campaign contribution limitations that are imposed on all other candidate campaign committees, the law also results in a concomitant exemption from expenditure limitations. To understand how this plays out in a real-life political campaign, let's take the example of GFLEC's expenditure of $1miliion on behalf of Andrew Pinson, a Kemp appointee to the Georgia Supreme Court that faced opposition in May of this year.  While GFLEC could pay for advertisements directly for Justice Andrew Pinson and in direct coordination with Pinson's campaign, an individual donor to his opposition's campaign would be limited not only in the direct amount of money contributed but also in any amount that the donor wanted to **expend** on behalf of the opposition candidate in the same way. This is an important distinction in the law. As noted by U.S. Supreme Court in *Buckley v. Valeo*, "expenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do [limitations] on financial contributions." *Buckley*, 424 U.S. at 25.

The LC Law severely burdens DPG's First Amendment rights by permitting certain incumbents to chair and to establish "[a] leadership committee [that] may accept contributions or make expenditures for the purpose of affecting the outcome of [the] election" and "defray ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office." O.C.G.A. § 21-5-34.2(d). Under the LC Law, "the contribution limits" that apply to any other candidate, candidate committee, or political donor pursuant to the Act "shall not apply" to a tightly-chosen few that chair a "leadership committee." *Id.* § 21-5-34.2(e).

Speaking plainly: there can be no serious dispute that these "asymmetrical limits" severely burden DPG and its members and constituents' freedom of speech and association. *Davis*, 554 U.S. at 741. Money is the lifeblood of modern political campaigns because "virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976); *accord Citizens United v. FEC*, 558 U.S. 310, 351 (2010) ("All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech . . . ."). "[T]elevision, radio, and other mass media" are "expensive," *Buckley*, 424 U.S. at 19, and candidates must often hold large-scale "[s]peeches and rallies" to connect with voters, events which "generally

14

necessitate hiring a hall and publicizing the event," *id.* Even the "distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs." *Id.*

To defray these campaign expenses, candidates must engage in fundraising. The Supreme Court has recognized that "[l]imits on contributions necessarily increase the burden of fundraising." *Randall*, 548 U.S. at 245 (quoting *Buckley*, 424 U.S. at 96). That is because "contribution ceilings . . . require candidates and political committees to raise funds from a greater number of persons" than they otherwise would to "amass[ ] the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21–22. Because "[f]undraising consumes candidate time that otherwise would be devoted to campaigning," *Randall*, 548 U.S. at 246 (citation omitted), a law that produces "fundraising advantages" for the candidate's opponent is undeniably a "drag on First Amendment rights," *Davis*, 554 U.S. at 739.

The LC Law places DPG and its Democratic candidates at precisely this type of electoral disadvantage. Under the Act, the Democratic candidates targeted by KEMP and GFLEC may accept no more than $3,300 for the general election. Thus, to compete dollar-for-dollar with KEMP and GFLEC, the targeted Democratic candidates must raise contributions from vastly more contributors. This requires these candidates to expend more candidate time and more campaign resources on fundraising than their Kemp-backed Republican opponents.

The asymmetry created by the LC Law is similar to – at least in effect – to that which the Supreme Court found unconstitutional in *Davis*. There, the challenged statute raised contribution limits for only one candidate in a single race. The other candidate in the race, therefore, faced the possibility that his opponent would be able to raise additional funds above and beyond the otherwise applicable contribution limits. The Supreme Court held that this was an "unprecedented penalty," a "special and potentially significant burden" that was not justified by a compelling state interest. *Davis*, 554 U.S. at 739–40; *see also Ariz. Free Enter.*, 564 U.S. at 736–40 (enjoining statute that penalized speech by providing extra public financing to candidate's opponent). The same burden and penalty are in play here, just at geometric (or greater) levels.

### (c) The LC Law is not Supported by a Sufficiently Important or Compelling State Interest

Because the LC Law substantially burdens Plaintiff's First Amendment rights, the law "cannot stand unless it is 'justified by a compelling state interest.'" *Davis*, 554 U.S. at 740 (*quoting Mass. Citizens for Life*, 479 U.S. at 256). "[T]he only legitimate and compelling government interests thus far identified [by the Supreme Court] for restricting campaign finances" are "[p]reventing corruption or the appearance of corruption." *Id.* at 741 (*quoting FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496–97 (1985)).

The LC Law has nothing to do with either. In this context, "corruption" means "*quid pro quo* corruption," that is, "a direct exchange of an official act for money." *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (plurality); *see also Citizens United*, 558 U.S. at 359 ("[C]orruption is the financial *quid pro quo*: dollars for political favors . . . ."). But to the extent that interest "is served by contribution limitations," *Ariz. Free Enter.*, 564 U.S. at 751, the Law undermines, rather than advances, that interest by retaining contribution limits for everyone but a select few that are given the ability to chair a leadership committee. It is inconceivable that a law designed to advance an anti-corruption interest would remove contribution limits only for a select group of incumbent officeholders while maintaining them for challengers. This is not surprising since there is nothing in legislative record of the LC Law that the General Assembly sought to address *quid pro quo* corruption, or anything approximating its appearance.[6]

---

[6]     This stands in marked contrast to *Buckley*, where a congressional select committee determined that the problem of *quid pro quo* corruption was "not an illusory one." 424 U.S. at 27 & n.28; *see Buckley v. Valeo*, 519 F.2d 821, 839 n.35 (D.C. Cir. 1975), *aff'd in part, rev'd in part,* 424 U.S. 1 (1976). It is also unlike *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), where Congress banned contributions and expenditures by foreign nationals only after "an extensive investigation by the Senate Committee on Governmental Affairs" concluded that foreign governments had attempted "to 'influence U.S. policies and elections through, among other means, financing election campaigns.'" *Id.* at 283 (quoting S. Rep. No. 105-67, at 47 (1998)); *see also McConnell v. FEC*, 251 F. Supp. 2d 176, 209 (D.D.C.) (examining "evidentiary submissions" comprising "over 100,000 pages of materials"), *judgment entered*, 251 F. Supp. 2d 948 (D.D.C. 2003), *aff'd in part, rev'd in part*, 540 U.S. 93 (2003). There is no such legislative record here.

Instead, the proponents of the LC Law claimed it would promote "transparency." *See* Georgia State Senate, *Legislative Day 24 (2/26/21)*, YouTube (Feb. 26, 2021), https://youtu.be/LhjTLrabGE8 (floor statement by bill sponsor Sen. Jeff Mullis, at 3:41:10 to 3:48:23) (emphasizing that SB 221 would promote "transparency" to stop the influx of "dark money" in Georgia politics); *see also* James Salzer, *Georgia Senate GOP passes bill to get more money from big political donors*, The Atlanta J.-Const. (Feb. 26, 2021), https://bit.ly/3qJgTBw.[7] But that purported rationale is inapposite because the LC Law merely incorporates by reference the same disclosure requirements that are already applicable under the Act. *See* O.C.G.A. § 21-5-34.2(e). In any event, transparency does nothing to address the Amendment's "asymmetrical limits." *Davis*, 554 U.S. at 741. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Id.* at 741–42 (quoting *Buckley*, 424 U.S. at 48–49).

No doubt scrambling for a constitutionally sufficient justification for an unconstitutional law, transparency has been urged by everyone from the Senate

---

[7]   Compare with Floor speech of Georgia State Senator Jen Jordan in opposition to SB 221 *https://youtu.be/7MJJW-buuaM* (stating that name given to legislation suggesting intent of bill was to provide transparency was incorrect and instead SB 221 should be called "the 'Rules Don't Apply to Us Act,' the 'Incumbency Protection Act,' the 'We Should be Ashamed Act.'")

sponsor of the bill to lawyers hired by Governor Kemp and his leadership

committee. However, the idea that this law's purpose and effect has resulted in

more transparency is specious. The argument goes that because the law requires

the leadership committees to disclose their donors, it should be characterized as a

disclosure regulation. And thus, the whole scheme survives constitutional scrutiny,

strict or otherwise. Indeed, it has been urged that because the large, unrestricted

amounts of cash being given to a leadership committee, like GFLEC, are allegedly

out in the open, *quid pro quo* arrangements will be easier to ferret out for members

of the public. While at first blush, it seems to be a legitimate justification, it comes

up short in two very important ways.

First, as to transparency, the law did not make any changes with respect to

disclosure requirements. None. It just requires leadership committees to follow

existing disclosure laws. There is no greater amount of transparency, at all.

Second, as to any kind of intimation that this law will curtail blatant attempts

of those with money to improperly influence government (*i.e., quid pro quo*

transactions), the LC law exempts leadership committees from the one existing

campaign finance law that was passed to directly fight such corruption, O.C.G.A. §

21-5-35.[8]   O.C.G.A. § 21-5-35(a), the prior law which still prohibits contributions

---

[8]      Section 21-5-35(a) provides: **"**No member of the General Assembly or that
member's campaign committee or public officer elected [statewide] or campaign
committee of such public officer shall seek or accept a contribution or a pledge of a

during a legislative session for all members of the General Assembly and all other statewide elected officials (except a sitting Governor or Lieutenant Governor and the members of the House and Senate Caucuses who establishes a leadership committee under § 21-5-34.2), was enacted for the purpose of preventing the appearance of a *quid pro quo* between the giving of a contribution and legislative action taken by the recipient of the contribution. *See Teper v. Miller*, 82 F.3d 989, 994-95 (11th Cir. 1996) ("[T]he purpose of the state law is, as the Attorney General and State assert, to prevent the appearance of impropriety—bribery, to be precise that may arise when state legislators accept campaign contributions during the period of time when they are actually legislating.").

That law prevents sitting Georgia senators, members of the house, and any other public officer elected statewide from accepting campaign contributions during the legislative session, specifically to prevent *quid pro quo* contributions and to avoid the appearance of improper influence when laws are being passed. Consequently, because legislators and constitutional officers are prohibited from accepting contributions during the legislative session, there is currently no ongoing requirement to disclose contributions received during the legislative session that could provide the public notice of potential *quid pro quo* transactions at the point

---

contribution to the member, the member's campaign committee, or public officer elected state wide, or campaign committee of such public officer during a legislative session."

in time when something could actually be done about it.[9]  That means that even taking into account the LC law's disclosure requirement, it does nothing to prevent abuse or corruption; instead, it provides fertile ground for political graft at this State's highest levels of power.

In reality, the only interest the LC Law serves is incumbent protection and insulation, for select incumbents. But that interest has "ominous implications," as it would allow the government "to arrogate the voters' authority to evaluate the strengths of candidates competing for office." *Davis*, 554 U.S. at 742. By enacting a campaign finance law that not only works to protect a handful of powerful incumbents but also gives those incumbents the power to pick winners and losers (by using their leadership committees to pour unlimited funds into the campaigns of their chosen candidates), Georgia not only makes a judgment as to who is worthy of election but also empowers the LC chairs to do the same. "The Constitution, however, confers upon voters" the

---

[9]    To see how Georgia law has addressed the need for heightened reporting during a period where regular disclosures aren't required but transparency and real time public notice is imperative, one need look no further than the "2-business day" rule.  This rule imposes a heightened disclosure requirement that requires a campaign committee to disclose any contribution of $1,000 or more if that contribution is received between the last report due before an election and the day of the election. Real transparency with respect to leadership committees and the contributions that they receive during the legislative session would require this type of ongoing reporting **at a minimum**.

power to choose their representatives, not the state, and "it is a dangerous business" for Georgia "to use the election laws to influence the voters' choices." *Id.*

### (d) The LC Law is not Narrowly Tailored

Even if there were some sufficiently important or compelling interest at play, the LC Law "is poorly tailored" to achieve the alleged end. *McCutcheon*, 572 U.S. at 218; *see Ams. for Prosperity Found.*, 141 S. Ct. at 2383 ("While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest."). Several reasons, here.

To begin with, the LC Law exempts chairs and their leadership committees from the one anti-corruption measure found in Georgia law, the law prohibiting the solicitation and receipt of campaign contributions during the legislative session. And, the LC Law leaves in place the Act's contribution limits for challengers but removes them for a select few incumbents. That makes no sense for purposes of fighting corruption, because actual or apparent corruption relating to campaign contributions is inherently tied to the potential for misuse of public office. *See Buckley*, 424 U.S. at 30; *cf. Ted Cruz for Senate v. FEC*, 2020 U.S. Dist. LEXIS 245638 (D.D.C. June 3, 2021) ("[T]he risk of *quid pro quo* is virtually non-existent where the contribution is made to a losing candidate . . . ." (*quoting Anderson v. Spear*, 356 F.3d 651, 673 (6th Cir. 2004))). Thus, whatever

anticorruption interest Georgia may have in restricting contributions to **candidates**, that interest is even stronger with respect to **incumbents**. Nor is the LC Law tailored to an interest in "transparency" as it just incorporates by reference the disclosure requirement already required by law.

### (e) The LC Law Violates DPG's Right to Equal Protection

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the State from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. When legislation classifies persons in a way that results in unequal treatment under the law, the level of scrutiny that applies depends on the basis for the classification. *See Gary v. City of Warner Robins*, 311 F.3d 1334, 1337 (11th Cir. 2002). "If a fundamental right or a suspect class is involved, the court reviews the classification under strict scrutiny." *Id.*

Here, the LC Law does not involve an immutable and suspect classification like race, but it does involve a political right repeatedly described as "fundamental." *McCutcheon*, 572 U.S. at 227 (plurality opinion). As a result, the classification must be "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  Under this Court's rulings in *Perdue, One Georgia, and Graham*, referenced *supra*, the State's purported interest in transparency is not sufficient to satisfy any of the requisite levels of scrutiny.

**(2) Plaintiff DPG and its Members and Constituents are Suffering Immediate and Irreparable Harm**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *see also Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) ("[V]iolations of first amendment rights constitute *per se* irreparable injury"). "The rationale behind these decisions is that chilled free speech . . ., because of its intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole." *Scott v. Roberts,* 612 F.3d 1279, 1295 (11th Cir. 2010) (cleaned up).

**(3) The Balance of Equities Favors Plaintiff DPG**

The Court must consider the potential impact that the requested injunction might have upon Defendant and to balance that potential with the considerable and irreparable harms that Plaintiff would suffer should its request be denied. There is no question that the balance of equities tips in the Plaintiff's favor. Allowing leadership committee chairs like Defendant KEMP to play kingmaker by picking and choosing the beneficiary of unlimited contributions raised through GFELC, while, at the same time, the Democratic candidates that KEMP is targeting are restricted to the statutory limit of $3,300 by Georgia law is "antithetical to the First Amendment." *Davis*, 554 U.S. at 743-44.

**(4) The Public Interest Favors Plaintiff**

As this Court has held before, the public has no legitimate interest in the enforcement of an unconstitutional statute. *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). The requested injunction, if granted, would therefore favor the public interest.

## <u>CONCLUSION</u>

Modern politics are somewhat of an ugly business. Divisiveness seemingly rules the day, all the better when in public forums that are expensive to support, maintain, and effectuate. All the more reason to suspect statutes that seemingly insulate and propagate incumbents, instead of ensuring a fairhanded playing field from which voters can make its own decision as to which candidates to support. The LC Law is hopelessly unconstitutional, and the Court should enjoin further efforts under its guise, that subvert fair elections and campaigns.

RESPECTFULLY SUBMITTED, this 18th day of July 2024.

/s/Jennifer Auer Jordan
JENNIFER AUER JORDAN
Georgia Bar No. 027857
DARREN SUMMERVILLE
Georgia Bar No. 691978
KRIS ALDERMAN
Georgia Bar No. 179645
ELIZABETH STONE
Georgia Bar No. 684098

THE SUMMERVILLE FIRM, LLC

1226 Ponce de Leon Avenue, NE
Atlanta, GA 30306
T: 770.635.0030
F: 770.635.0029