**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DEMOCRATIC PARTY OF
GEORGIA, INC.,

        *Plaintiff*,

        v.

BRIAN KEMP, in his official capacity
as Governor of Georgia,

        *Defendant*.

Civil Action
No. 1:24-cv-03154-MHC

**DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

BACKGROUND ......................................................................... 2

ARGUMENT .............................................................................. 5

    I.    The Party Has Not Established Its Standing. ................................. 6

        A.    The Party Has Failed to Demonstrate a Concrete Injury. ....... 7

        B.    The Party Has Failed to Show Traceability or
              Redressability. ................................................................ 9

    II.    The Party Has Not Demonstrated Irreparable Injury. ................... 11

    III.    The Party Has Not Demonstrated a Substantial Likelihood of
        Success on the Merits of Its Facial Challenge. ............................. 14

        A.    The Party hasn't attempted to satisfy the requirements
              for a facial challenge. ..................................................... 15

        B.    The Act does not restrict the Party's speech. ...................... 16

        C.    The Act serves important interests. .................................... 19

        D.    The Act is closely drawn to those interests. ........................ 22

        E.    The Party cannot repackage its implausible First
              Amendment claim as an equal protection violation. .............. 24

    IV.    The Balance of Harms and the Public Interest Weigh Heavily
        Against the Party. ............................................................... 25

CONCLUSION .......................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ala. Democratic Conf. v. Att'y Gen. of Ala.*,
838 F.3d 1057 (11th Cir. 2016) ........................................................ 15, 20, 25

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ................................................................................. 15

*Buckley v. Valeo*,
424 U.S. 1 (1976) .................................................................................... 15

*City of South Miami v. Governor of Fla.*,
65 F.4th 631 (11th Cir. 2023) ................................................................ 8, 9

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) ................................................................................. 21

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) .................................................................. 13, 18, 19, 24

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................. 12

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................................................. 8

*Graham v. Carr*,
634 F. Supp. 3d 1343 (N.D. Ga. Oct. 6, 2022) .......................................*passim*

*Hand v. Scott*,
888 F.3d 1206 (11th Cir. 2018) ............................................................... 25

*In re Burns*,
887 F.2d 1541 (11th Cir. 1989) ............................................................... 22

*Jacobson v. Fla. Sec'y of State*,
974 F.3d 1236 (11th Cir. 2020) ............................................................... 6, 9

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*,
558 F.3d 1301 (11th Cir. 2009) ............................................................... 15

*Lewis v. Governor of Ala.*,
944 F.3d 1287 (11th Cir. 2019) ............................................................... 6, 10

*Martinez v. Mathews,*
    544 F.2d 1233 (5th Cir. 1976) .......................................................... 5

*McCutcheon v. FEC,*
    572 U.S. 185 (2014) ................................................................. 23, 24

*Muransky v. Godiva Chocolatier, Inc.,*
    979 F.3d 917 (11th Cir. 2020) ......................................................... 7

*One Georgia, Inc. v. Carr,*
    601 F. Supp. 3d 1291 (N.D. Ga. Apr. 28, 2022) ................................... 1, 4, 13

*Perdue v. Kemp,*
    584 F. Supp. 3d 1310 (N.D. Ga. Feb. 7, 2022) ....................................*passim*

*Romanick v. Mitchell,*
    No. 2:21-cv-0065-SCJ, 2021 WL 5034369
    (N.D. Ga. July 13, 2021)............................................................. 12, 13

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ..................................................... 5, 12

*Support Working Animals, Inc. v. Governor of Fla.,*
    8 F.4th 1198 (11th Cir. 2021) ....................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................... 5, 25

*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016) ..................................................... 13, 14

**Statutes**

O.C.G.A. § 21-5-3 ....................................................................... 3

O.C.G.A. § 21-5-5 ...................................................................... 20

O.C.G.A. § 21-5-34 ...................................................................... 3

O.C.G.A. § 21-5-34.2 ..............................................................*passim*

O.C.G.A. § 21-5-35 ..................................................................... 20

O.C.G.A. § 21-5-41 ............................................................... 3, 7, 17

**Regulation**

Ga. Comp. R. & Regs. 189-6-.04 .............................................................. 3, 20, 21

**Other Authorities**

Ga. State Ethics Comm'n,
*Contribution Limits* ............................................................................. 3

*Hr'g on S.B. 221*,
2021 Leg., 156th Sess. (Sen. Mullis), YouTube (Feb. 23, 2021) ................... 22

*Hr'g on S.B. 221*,
2021 Leg., 156th Sess., YouTube (Feb. 26, 2021) ........................................ 22

James Salzer,
*Kemp's special 'leadership fund' raises $2.3 million*,
Atlanta J.-Const. (Feb. 7, 2022) .................................................................. 24

## INTRODUCTION

Through this lawsuit, Plaintiff Democratic Party of Georgia, Inc. (the "Party") asks this Court to strike down O.C.G.A. § 21-5-34.2 (the "Act"), which authorizes the creation of leadership committees. Although this Court has heard three prior cases with analogous but different challenges, it has not struck down the Act, and it has refused to enter preliminary injunctions against Governor Kemp in his official capacity. *See Perdue v. Kemp*, 584 F. Supp. 3d 1310 (N.D. Ga. Feb. 7, 2022); *One Georgia, Inc. v. Carr*, 601 F. Supp. 3d 1291 (N.D. Ga. Apr. 28, 2022); *Graham v. Carr*, 634 F. Supp. 3d 1343 (N.D. Ga. Oct. 6, 2022). The Court should do likewise here.

Most fundamentally, the Party has failed to demonstrate standing. Unlike in prior cases challenging the Act, this case does not involve a challenge by one candidate, who lacks a leadership committee, running against another candidate who *has* a leadership committee. Instead, the Party, its members, and all other candidates for office in Georgia have equal access to contributions from various leadership committees authorized by the Act, and the Party has thus failed to identify any harm. But even if the Party had identified an injury, that injury would have been the result of existing contribution limits, in a *different* statute, which the Party does not challenge. Moreover, by seeking an amorphous injunction against Governor Kemp, who has no role in enforcing the Act, the Party falls short of demonstrating traceability and redressability.

Additionally, the Party has failed to satisfy any of the preliminary-injunction requirements: The Party has not demonstrated irreparable injury because it has multiple Democratic leadership committees available for use. And the Party cannot demonstrate a substantial likelihood of success on the merits, as the record conclusively demonstrates that the Act was passed to increase transparency in Georgia elections by pulling contributions away from non-transparent third-party entities and into leadership committees, which must report most contributions. Moreover, Georgia did so in a sufficiently tailored way, where only a few committees were authorized, thus ensuring easier oversight. And, while this Court has previously expressed skepticism about these points, those challenges arose under very different facts.

Finally, any perceived harm the Party faces is significantly outweighed by the harm an injury would inflict on the public. Indeed, members of the public have already made significant contributions over the previous years to various leadership committees. The Party apparently seeks to undo each of those contributions in the waning months before an election. The Court should reject the Party's request to insert such upheaval into Georgia's elections and to harm the public's First Amendment rights.

## BACKGROUND

Georgia law sets contribution limits for all candidates for state offices—incumbents and nonincumbents alike. Specifically, adjusted for inflation,

contributions may not exceed $8,400 for primary and general elections, and $4,800 for runoffs. O.C.G.A. § 21-5-41(a), (k); Ga. State Ethics Comm'n, *Contribution Limits,* https://tinyurl.com/msmwhk45.

1. Before the Act, candidates "who [we]re not current statewide office holders or members of the General Assembly ha[d] the same maximum contribution limit … but [could] seek and accept contributions during the legislative session." *Perdue*, 584 F. Supp. 3d at 1315. Incumbents, however, could not fundraise during the legislative session. And donors seeking to support incumbents during the legislative session could do so *only* by contributing to third-party organizations (*e.g.,* PACs, etc.), which less regularly report contributions, and which may spend without limits if they do not coordinate with particular candidates.[1] *See* Ga. Comp. R. & Regs. 189-6-.04; O.C.G.A. §§ 21-5-3(15); 21-5-34(a)(1)(B). As a result, before the Act, there was substantial involvement from such non-transparent outside entities.

To address the discrepancy in contribution limits and proliferation of money going to non-transparent third-party organizations, in 2021 the General Assembly passed the Act. It authorizes creation of several leadership committees, split between the executive and legislative branches. O.C.G.A.

---

[1] Although PACs are required to file disclosures, O.C.G.A. § 21-5-34(a)(1)(B), many evade that requirement through various loopholes, like accepting contributions through social welfare organizations.

§ 21-5-34.2(a). The majority and minority caucuses of each legislative chamber may each designate "up to two political action committees" as leadership committees. *Id.* So may the governor and lieutenant governor and the duly nominated challengers following the primary. *Id.*

Under the Act, leadership committees may accept contributions year-round, and they may make expenditures for various purposes, including "affecting the outcome of any election or advocating for the election or defeat of any candidate," or "defray[ing] ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office[.]" *Id.* § 21-5-34.2(d). Such committees must disclose contributions over $500. *Id.* § 21-5-34.2(e). Since the Act was enacted, many leadership committees have been established in Georgia, by Republicans and Democrats alike. Decl. of S. Knittel ¶ 6 (attached as Exhibit A) ("Knittel Decl.")

2.  In the three years since its enactment, there have been three lawsuits challenging the Act. *See Perdue*, 584 F. Supp. 3d 1310; *One Georgia*, 601 F. Supp. 3d 1291; *Graham*, 634 F. Supp. 3d 1343. In each case, the plaintiff sought a preliminary injunction, which this Court granted (in part) in two cases—*Perdue* and *One Georgia*—but denied in *Graham*. As demonstrated below, this case differs substantially from each of these previous challenges: Here, for example, the Party sues only Governor Kemp, and only in his official capacity, but asks the Court to preliminarily "prohibit[] the State of Georgia from

enforcing [the Act.]" Pl.'s Mot. for Prelim. Inj. at 1 ("PI Mot.") (Doc. 2).

## ARGUMENT

As the Supreme Court confirms, beyond establishing jurisdiction, the Party must demonstrate that it has a substantial likelihood of prevailing on its claim; it will suffer irreparable injury in the absence of an injunction; the balance of equities tips in the Party's favor; and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 19–20 (2008). A plaintiff must have "clearly established" each factor. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). However, a mandatory injunction, like the one the Party seeks here, "goes well beyond simply maintaining the status quo *pendente lite*, [and] is particularly disfavored[.]" *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

Applying these settled principles and standards, the Court should deny the Party's motion for any of several independent reasons. First, the Party has failed to carry its burden of demonstrating standing—and therefore that the Court even has jurisdiction over this case. Second, for some of the same reasons, the Party has failed to establish irreparable injury. Third, the Party has failed to demonstrate a likelihood of success on the merits—especially given that their claim is a facial rather than an as-applied challenge. And fourth, the Party has not and cannot establish that the balance of the equities or the public interest favors preliminary injunctive relief.

## I.       The Party Has Not Established Its Standing.

As to standing: As the Eleventh Circuit explains, "standing to sue implicates jurisdiction, [and] a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019). To demonstrate standing, the Party "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). The Party fails at each turn.

According to the Party, it has standing for three reasons: (1) associational standing through its members who are candidates for office (Compl. ¶ 36 (Doc. 1)); (2) associational standing through its members who want to donate to individual Democratic candidates directly in excess of applicable contribution limits (*id.* ¶ 37); and (3) standing on its own because of the Party's desire to expend amounts on behalf of an individual Democratic candidate in excess of applicable contribution limits (*id.* ¶ 38). But each theory of standing fails to establish injury in fact, traceability, or redressability.

Before addressing the shortcomings of the Party's specific arguments, one dispositive failure spans all three theories of standing—the Party challenges the wrong statute. Although the Party purports to complain about the Act, its real complaint—and its only conceivable basis for claiming harm—

is with the contribution limits imposed by a separate statute: The Party's and its members' desires to donate to individual Democratic candidates directly and in excess of statutory limits are not redressable by an order from the Court in this case because contribution limits are imposed by a *different* statute, O.C.G.A. § 21-5-41, which the Party does not challenge.[2] The same is true for the Party's members who are running for office and wish to receive larger contributions. In this way, the Party's complaints mirror those made by the plaintiff in *Graham*, who complained about perceived inequality in Georgia's political contribution laws, but "fail[ed] to allege that O.C.G.A. § 21-5-41 is being applied by Defendant[] in an unconstitutional manner." 634 F. Supp. 3d at 1352. The Party fails to demonstrate standing here for the same reason.

### A.    The Party Has Failed to Demonstrate a Concrete Injury.

This failure infects the Party's attempt to establish a concrete injury from the Act. In this Circuit, organizations must establish distinct injury that is "concrete, particularized, and actual or imminent, rather than conjectural or hypothetical." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 925 (11th Cir. 2020) (en banc). The Eleventh Circuit does not permit "[m]ere conclusory statements," and "fears of hypothetical future harm" do not suffice. *Id.* at 924–

---

[2] The Party can also exceed these limits, further undermining any claim of injury. O.C.G.A. § 21-5-41(j) ("The contribution limitations provided for in this Code section shall not include contributions or expenditures made by a political party in support of a party ticket or a group of named candidates.").

26 (quotation marks omitted). Rather, as the Supreme Court recently confirmed, "the injury must affect the plaintiff in a personal and individual way and not be a generalized grievance." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (cleaned up). And, for claims based on possible *future* harms, plaintiffs in this Circuit must "prove that their threatened injuries are '*certainly* impending,'" not speculative. *City of South Miami v. Governor of Fla.*, 65 F.4th 631, 636 (11th Cir. 2023) (emphasis added) (cleaned up).

Despite these requirements, the Party has "failed to produce concrete evidence that [the Act] is an imminent threat to [its] members[.]" *Id.* at 640. For its members running for office in 2024, the Party alleges they are harmed by having to operate under greater limitations and having less time to fundraise because they must wait until the Party nominates a candidate for governor and lieutenant governor before they can receive contributions from a gubernatorial leadership committee. Compl. ¶¶ 38–39, 46–47, 54–55, 58. Not so. Any such member candidate may receive contributions *now* from the Democratic legislative caucus's leadership committees. *See* O.C.G.A. § 21-5-34.2(d), (e). Thus, the Party does not show why its members must await a gubernatorial leadership committee.[3]

---

[3] Moreover, the Party's theory here assumes such a gubernatorial leadership committee would make contributions in accordance with the Party's preferences, although such decisions would be the committee's, not the Party's.

The Party's theory of harm related to the 2026 elections is even more speculative. PI Mot. at 5–6. That theory is based on a host of assumptions about fundraising, spending, and candidates over the next two years. Such speculation will not do. *See City of South Miami*, 65 F.4th at 636–37. It is not certain the current Governor or Lieutenant Governor will transfer funds from their existing leadership committees to 2026 Republican candidates, and there is no reason the Party's 2026 gubernatorial candidate cannot start fundraising now through the Democratic legislative caucus leadership committees. The Party's speculation about potential harm in future years does not come close to showing concrete, irreparable injury. Thus, the Party fails to demonstrate a concrete injury in 2024 or beyond.

**B.    The Party Has Failed to Show Traceability or Redressability.**

The Party also lacks standing because it asks the Court to assume traceability and redressability where there is none. In this Circuit, "a plaintiff's injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Jacobson*, 974 F.3d at 1253 (cleaned up). It must also be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" and that "other state actors, who aren't parties to the litigation" would not "remain free … to engage in the conduct that the plaintiffs say

injures them." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201, 1205 (11th Cir. 2021) (cleaned up). The Party fails to satisfy these requirements.

As to traceability, the Party argues it is harmed by Governor's Kemp's "ability to receive and expend unlimited campaign contributions," and that harm "is traceable to the inequitable scheme" that permits leadership committees. PI Mot. at 9. That theory suffers numerous flaws. For one, Governor Kemp has no greater "ability to receive and expend unlimited campaign contributions" than the Democrats' existing leadership committees. For another, any complaint about contribution limits can be traced to pre-existing Georgia law setting those limits, which the Party does not challenge.

Moreover, the Party ignores that Governor Kemp has no enforcement authority under the Act, confirming that the Party has not shown any connection between the complained-of injury and Governor Kemp. Indeed, the Party has not even tried to identify *any* relevant enforcement authority. *See generally* PI Mot. And, under controlling precedent, when no defendant has enforcement authority, there is no injunctive relief (preliminary or permanent) available. *Lewis*, 944 F.3d at 1300–01.

The Party's shortcomings are illustrated by the Court's decision in *Graham*. Like the plaintiff in *Graham*, the Party did "not specify what the sought-after relief would look like in practical terms." 634 F. Supp. 3d at 1350.

In that case, the Court refused to find traceability because "the Complaint fail[ed] to allege that Defendants ha[d] instituted or threatened to institute any action to enforce the [Act] against Plaintiffs." *Id.* at 1352. So too here, Governor Kemp has not threatened to enforce the Act against the Party.

Same for redressability: The Court in *Graham* found a facial challenge to be the wrong remedy because it "would require this Court to rewrite the [Act][.]" *Id.* at 1353, 1356–57. Though the *Graham* Court believed the plaintiffs had sufficiently alleged an injury in fact, the Court was "not clear how [precluding enforcement]" of the Act "serves Plaintiffs' purpose or redresses the alleged inequity created by the [Act]." *Id.* at 1356 & n.3. Further, there was no evidence that the *Graham* defendants *could* enforce who may form leadership committees because it was "a matter of statute." *Id.* at 1353.

Here, the Party's complaint about who can form a leadership committee is *still* a matter of statute that, as acknowledged in *Graham*, "does not purport to give [Governor Kemp] any discretion in the matter." *Id.* Thus, even if this Court found an injury in fact, the Party's motion asks the Court to rewrite the Act and enjoin Governor Kemp from enforcing it, which is "untenable." *Id.* at 1357. The Party has therefore not carried its burden to demonstrate standing.

## II.   The Party Has Not Demonstrated Irreparable Injury.

The Party's motion also fails to establish irreparable injury. In this Circuit, "[i]rreparable injury must be neither remote nor speculative, but

actual and imminent." *Siegel*, 234 F.3d at 1176. The Eleventh Circuit further confirms that: "A showing of irreparable injury is the *sine qua non* of injunctive relief." *Id.* at 1175–76 (cleaned up). Where there is "no showing of irreparable injury," "[a] court need not address the other elements of a preliminary injunction[.]" *Romanick v. Mitchell*, No. 2:21-cv-0065-SCJ, 2021 WL 5034369, at *5 (N.D. Ga. July 13, 2021). Under these standards, the Party fails to demonstrate irreparable injury for at least two reasons.

1. The Party fails to demonstrate *any* injury from the Act, let alone an irreparable one. While "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 376 (1976), the Act does not impact the Party's First Amendment rights in any way. *See infra*, Part III. The Party and its members may make any political contributions they wish, provided they comply with the contribution limits in statutes the Party does not challenge. The Party may make an unlimited contribution to one of the Democratic leadership committees, which may then support Democratic candidates in Georgia. And the Party's members who are candidates for office have equal access to contributions from existing leadership committees.

On these facts, this case differs substantially from *Perdue*, where this Court found that the plaintiff satisfied the irreparable injury requirement. 584 F. Supp. 3d at 1327. In *Perdue*, this Court concluded that a candidate's First

12

Amendment rights were implicated when "a candidate in the same primary election" was unable "to receive unlimited contributions in the same manner as" his opponent in that primary. *Id.* at 1319. There is no such head-to-head competition here. And that fact also differentiates this case from *Davis v. Federal Election Commission*, 554 U.S. 724 (2008), where "a competing candidate [in the *same election*] may raise three times the normal limit on contributions from individual donors," *Perdue*, 584 F. Supp. 3d at 1319 (discussing *Davis*, 554 U.S. at 729).[4] Here, by contrast, the Party has not identified *any* electoral contest where a candidate faces a different contribution limit or access to financial support compared to his or her opponent. Accordingly, the Party has not demonstrated any injury from the challenged statute, let alone an irreparable one.

2. The lack of any irreparable injury is confirmed by the Party's delay in bringing this action, a fact that further "undermines any claim that [the Party] face[s] imminent irreparable harm in the absence of injunctive relief." *Romanick*, 2021 WL 5034369, at *5; *accord Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). As noted, the Act was enacted in July

---

[4] The same facts differentiate this case from other challenges to the Act. *See, e.g.*, *One Georgia*, 601 F. Supp. 3d at 1302 (discussing impact of the Act when one candidate in an election (Kemp) had access to a leadership committee earlier than another candidate in the same contest (Abrams)); *Graham*, 634 F. Supp. 3d at 1351–52 (discussing harm when candidates for the same office are subject to "unequal campaign finance scheme").

2021, and nearly all authorized entities established leadership committees shortly thereafter. Knittel Decl. ¶¶ 6–19. Accordingly, the Party has known about the Act and its alleged effect for years. Indeed, the Party's members formed their own leadership committees in 2021, and they remain active today. Decl. ¶¶ 8–9, 12–13. Yet it took the Party three years to challenge the Act, despite its allegedly irreparably harming the Party in all electoral contests over that time. This casts serious doubts about any irreparable injury. *See Wreal*, 840 F.3d at 1248.

The delay also undermines the Party's argument for another reason. While the Act has been in place for all election cycles since 2021, the Party failed to identify *any* evidence from those elections showing that it or any of its members have actually been harmed.

In short, the record is silent on *concrete* harm, despite years of available data. That silence forecloses the Part's claim of irreparable injury.

## III. The Party Has Not Demonstrated a Substantial Likelihood of Success on the Merits of Its Facial Challenge.

The Party also cannot show a substantial likelihood of success on the merits of its facial challenge to the Act. The Act itself does not limit the Party's speech, expression, or association in any way. To the contrary, the Act allows the Party's members access to multiple leadership committees that may receive and spend unlimited funds in support of its candidates. And the

existence of additional committees at the gubernatorial level adds nothing to that speech. In these circumstances, the Party has not begun to make the showing necessary to sustain a facial challenge to the Act. And, because the Act does not implicate the Party's speech, only rational basis review applies. *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). As shown below, more than a "rational relationship" exists between the objectives of transparency and preventing actual or apparent corruption "and the means" by which the Act seeks to "achieve it." *Id.* Further, even if a fundamental speech right were involved here, only intermediate scrutiny would apply, which the Act likewise satisfies. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam); *Ala. Democratic Conf. v. Att'y Gen. of Ala.*, 838 F.3d 1057, 1063 (11th Cir. 2016).

## A. The Party hasn't attempted to satisfy the requirements for a facial challenge.

As the Supreme Court confirms, the bar for the Party's facial challenge is even higher than merely alleging the Act limits its own speech—the Party must show that "*no set* of circumstances exists under which the [Act] would be valid," or that the Act lacks "a plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (emphasis added). But the Party has not attempted to satisfy this high bar, and it couldn't do so: Even if the Act restricted the Party's speech in some set of circumstances (it doesn't), the Act

obviously does not restrict the Party's speech across the board, as there are certainly *some* "circumstances under which the [Act] would be valid." For instance, the Party appears to agree that no harm would occur when two candidates in the same contest each have their own leadership committee. And that reality destroys the Party's facial challenge.

This Court's previous decisions on the Act, moreover, each involved as-applied challenges between a candidate with access to unlimited contributions and an opposing primary or general challenger. *See, e.g.*, *Perdue*, 584 F. Supp. 3d at 1316 (noting that two legislative committees had filed an amicus brief "oppos[ing] any facial challenge" impacting the authorization of legislative leadership committees). Accordingly, those decisions do not control here.

**B.    The Act does not restrict the Party's speech.**

Beyond that, nothing in the Act actually restricts the Party's speech, or the speech of its members. The alleged asymmetrical inability to receive and expend unlimited funds in support of the Party's candidates is entirely illusory: The Party's members already control four leadership committees and will gain two more during the next gubernatorial election. Thus, the very statute the Party challenges authorizes its *own* legislative caucuses to designate four leadership committees with the same ability to receive and expend unlimited funds that they complain about here. O.C.G.A. § 21-5-34.2(a).

The Party's free-speech argument is thus flawed in failing to challenge the statute that actually imposes contribution or expenditure limits:  O.C.G.A. § 21-5-41(a). Thus, even if this Court were to entertain the Party's contribution limits argument, the individual campaigns of every candidate, including the governor, the lieutenant governor, and every member of the General Assembly, remain subject to the same contribution limits as everyone else. O.C.G.A. § 21-5-41. The Act does not change those limits.

The Party's broader First Amendment concerns are also misplaced. For example, the Party notes that funding is the lifeblood of modern political campaigns. PI Mot. at 14 (citing cases). But nothing in the Act restricts that "lifeblood." The Party also argues that its candidates must spend more time fundraising instead of campaigning. *Id.* at 15. But the Party ignores that its candidates are eligible for funding from its own leadership committees. And, if there were any discrepancy in the amounts leadership committees have raised, that would be a matter of fundraising efficacy and donor enthusiasm, not any speech or funding restriction.

These facts easily differentiate this case from previous challenges to the Act, each of which turned on asymmetrical contribution limits between specific candidates. For instance, this Court has held that "the Supreme Court has 'never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other[.]'" *Perdue*, 584 F.

Supp. 3d at 1323 (quoting *Davis*, 554 U.S. at 738). But that is not this case, as the Party has not identified any candidates who lack access to a leadership committee who are facing a candidate who has a leadership committee.

In effect, the Act raises the contribution limits for committees selected by party leadership, benefiting *all* their candidates. The restrictions on individual candidates and campaigns remain the same. O.C.G.A. § 21-5-34.2(f). And the Supreme Court has held that, if a statute's effect "simply raised the contribution limits for all candidates," a speech challenge "would plainly fail." *Davis*, 554 U.S. at 737. Here, the Party complains (at 6–7) that Governor Kemp's leadership committee supports challenges to specific Democrat legislators, but the Party fails to explain why its *legislative* leadership committees cannot use the same types of donations Georgians First uses.

In fact, the races the Party complains about here are legislative races, and expenditures involving their leadership committees in the legislature are thus more closely aligned to the Party's incumbents than any committee headed by a yet-to-be-selected gubernatorial nominee would be.

In short, the Party, its members, and its supporters have equal access to political contributions through the four legislative committees they already control. The addition of two more leadership committees has nothing to do with speech by the Party or its various members.

18

### C.    The Act serves important interests.

Even if this Court concluded that the Act restricts the speech of the Party or its members, the Act still survives scrutiny. The Supreme Court has held that contribution and expenditure restrictions can be justified when they are "closely drawn to serve a sufficiently important interest[.]" *Davis*, 554 U.S. at 737 (cleaned up). And the Act remedies the handicap previously faced by incumbent officials by allowing fundraising during legislative sessions while protecting the anti-corruption and transparency interests that the no-fundraising-during-session ban was designed to protect.

1. Before the Act, the statutory scheme placed executive and legislative incumbents at the disadvantage of being unable to fundraise during legislative sessions. But the Act remedies this disadvantage, while preserving the restriction on individual members, by authorizing the creation of leadership committees that must "be a separate legal entity from a candidate's campaign committee[.]" O.C.G.A. § 21-5-34.2(f). While the restrictions remain in place for individual campaigns, the previously paralyzed officials may now receive funds through leadership committees subject to transparency that "plainly is related to and furthers the State's interest in preventing corruption and the

19

appearance of corruption." *Ala. Democratic Conf.*, 838 F.3d at 1065.[5]

Before the Act, moreover, donors had several ways to support an incumbent's campaign, directly or indirectly through: (1) campaign accounts when the legislature was *out* of session, O.C.G.A. § 21-5-5; (2) legislative caucus's campaign accounts; or (3) when the legislature is in session, outside political entities operating without any contribution limits whatsoever, Ga. Comp. R. & Regs. 189-6-.04. Indeed, this pre-Act scheme encouraged contributions away from traditional and transparent campaign accounts and into outside organizations that could raise funds year-round. The Act reversed that flow by eliminating disparities facing incumbents and providing a transparent alternative.

Even worse, before the Act, challengers in primary elections had a profound advantage over incumbents—challengers could raise money year-round, while incumbents were restricted to fundraising when the legislature was out of session. O.C.G.A. § 21-5-35(a). During an election year, this might mean that an incumbent could not fundraise from January to April, leaving just one month until the primaries and seven months until the general election. *Id.* This scheme left Georgians who wanted to support an incumbent during

---

[5] The Eleventh Circuit has left open the question of whether "transparency is alone a sufficient legal justification for a state to regulate campaign contributions[.]" *Ala. Democratic Conf.*, 838 F.3d at 1065. Defendant raises this point here merely to preserve the issue.

the legislative session with one option—to donate to outside organizations that are not required to report contributions. *See* Ga. Comp. R. & Regs. 189-6-.04.

2. By creating leadership committees that may accept contributions year-round and coordinate with campaigns, the Act creates much more attractive competitors to those less-transparent groups. The Act achieves this greater transparency by altering Georgia law to allow regulated leadership committees to fundraise throughout the legislative session. Moreover, any such committee that accepts contributions or makes expenditures exceeding $500 must submit the same disclosure reports that campaigns are required to file. O.C.G.A. § 21-5-34.2(e). Further, the Act requires that "[a]ll communications paid for by expenditures of the leadership committee" have "a disclaimer … that the communication is paid for by the leadership committee[.]" *Id.*

This plain text of the Act, as well as the record, show that it was enacted to promote transparency and to decrease *quid pro quo* corruption, as these disclosure and disclaimer provisions clearly serve to increase transparency, and there is no other plausible reason for Georgia to include them.

Nor would it be correct to reject Georgia's interest in transparency just because another purpose of the Act was to eliminate a discrepancy that barred incumbents from receiving contributions during the legislative session. It is axiomatic that a statute can serve multiple state interests. *See, e.g., Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 191 (2008) ("several state interests"

were "legitimat[e]" and "relevant").

This conclusion finds further support in the legislative record.[6] As the Act's primary sponsor made clear, the Act's goals of increasing transparency and preventing corruption were interrelated. *Hr'g on S.B. 221*, 2021 Leg., 156th Sess., YouTube, at 3:47:51 (Feb. 26, 2021), https://tinyurl.com/mullisfloor1 (stating that the Act was enacted to end "corrupt[] campaigning" by ensuring that contributions "will all be open"); *Hr'g on S.B. 221*, 2021 Leg., 156th Sess. (Sen. Mullis), YouTube, at 4:01 (Feb. 23, 2021), https://tinyurl.com/mullis223 ("contributions … are disclosed" so there is "no more dark money in these committees."). In short, by requiring leadership committees to disclose their contributions, and to include a disclaimer with their communications, the Act serves the important government interests of preventing corruption and its appearance, and of increasing transparency.

### D.   The Act is closely drawn to those interests.

The Act is also closely drawn to increase transparency and prevent actual or apparent corruption. Whether the General Assembly could have narrowed the statute further is irrelevant, as the State is not required to adopt the least restrictive means available to further its interests. The standard for

---

[6] In this Circuit, legislators' remarks are at least "somewhat useful piece[s] of legislative history[.]" *In re Burns*, 887 F.2d 1541, 1549 (11th Cir. 1989).

restrictions on political contributions "is a lesser demand than strict scrutiny." *Perdue*, 584 F. Supp. 3d at 1322 (cleaned up). But even stricter levels of constitutional scrutiny do not require a "perfect" fit between means and ends, only a "reasonable" one. *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014).

Instead, the Act provides each party a guaranteed four leadership committees, with an additional two per party in the executive branch. This limited number of leadership committees ensures that only a small number of electoral contests will involve an incumbent with a leadership committee. *See* O.C.G.A. § 21-5-34.2(a). For each such contest, the Act did not alter the pre-existing reality that the non-incumbent challenger may still fundraise during the legislative session. Moreover, the Act ensured that such non-incumbent challengers may also receive contributions directly from *other* leadership committees. *Id*. § 21-5-34.2(d). Through each of these features, the General Assembly ensured that the Act was closely drawn to serve the State's interests.

Indeed, the General Assembly could have responded to the influence of outside organizations presented by the legislative-session ban by allowing *all* incumbents to fundraise throughout the session. But it opted instead for a narrower solution underscoring the purpose behind the Act: By concentrating and incentivizing year-round fundraising in a small number of groups that may be more easily observed, the Act ensures greater transparency.

In fact, the Act has served its intended effect: While donors may

currently support Governor Kemp through Georgians First or outside groups not subject to transparency requirements, many have chosen to contribute to leadership committees rather than to an outside group.[7] Thus, the Act was "closely drawn to serve a sufficiently important interest." *Davis*, 554 U.S. at 737 (cleaned up). It in no way violates the Party's speech, expression, or association rights.

### E. The Party cannot repackage its implausible First Amendment claim as an equal protection violation.

The Party's motion (at 23) includes a half-page afterthought on Equal Protection. But the Party fails to cite even a single case involving a comparable Equal Protection challenge. Instead, the Party generically argues that, although the Act "does not involve an immutable and suspect classification like race," it does "involve a political right" that a plurality opinion described as fundamental. *Id.* (citing *McCutcheon*, 572 U.S. at 227). That case, however, was not about the Equal Protection Clause at all; it involved a First Amendment challenge. The two instances of the word "fundamental" in that opinion are both "fundamental First Amendment activities." *McCutcheon*, 572 U.S. at 196, 227. The *McCutcheon* decision thus does not support the Party's Equal Protection argument, and this argument fails to show that the Party is

---

[7] James Salzer, *Kemp's special 'leadership fund' raises $2.3 million*, Atlanta J.-Const. (Feb. 7, 2022), https://tinyurl.com/5ar7mbj2.

likely to succeed on the merits.

## IV. The Balance of Harms and the Public Interest Weigh Heavily Against the Party.

Finally, the Party fails to show its alleged injuries outweigh the injuries an injunction would cause the State and the public. *Winter*, 555 U.S. at 19–20. A State is always harmed by an injunction against a duly enacted statute. *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018). Moreover, the public would be harmed by an injunction here because many individuals have already made contributions to leadership committees, which would need to be reversed.

Additionally, the public has a clear interest in transparency in campaign finance, which helps prevent corruption. *Ala. Democratic Conf.*, 838 F.3d at 1065. An injunction would force the public and its funds back into the darkness that existed before the Act.

## CONCLUSION

The Party seeks to use this proceeding for political advantage. But the Party's request for a preliminary injunction must be denied because the Party lacks standing, lacks any injury (irreparable or otherwise), and has not come close to showing that it is likely to succeed on the merits of its facial challenge to the Act. Each of those is an independent reason to deny the motion. Moreover, the Court should deny the motion because granting the requested relief would inflict substantial harm and confusion on the public.

July 29, 2024

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505

Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580

*/s/ Elizabeth T. Young*
Elizabeth T. Young
Assistant Attorney General
Georgia Bar No. 707725
**STATE LAW DEPARTMENT**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Brian J. Field*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*\*Pro hac vice* application
forthcoming

26

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).


*/s/ Elizabeth T. Young*
Elizabeth T. Young