IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEMOCRATIC PARTY OF
GEORGIA, INC.,

      Plaintiff,

v.

BRIAN KEMP, in his Official
Capacity as the Governor of the State
of Georgia,

      Defendant.

CIVIL ACTION FILE

NO. 1:24-CV-3154-MHC

## ORDER

This case comes before the Court on Plaintiff Democratic Party of Georgia,

Inc. ("DPG")'s Motion for Preliminary Injunctive Relief ("Pl.'s Mot.") [Doc. 2].

This is the fourth challenge heard by this Court to a Georgia law enacted on July 1,

2021 (the "LC Statute"), codified at O.C.G.A § 21-5-34.2. The LC Statute

provides for the creation of "leadership committees" which can raise contributions

to candidates for political offices that are not subject either to the maximum

contribution limits otherwise imposed under Georgia law or the prohibition for

accepting contributions by certain incumbent officeholders during a legislative

session. The Court held a hearing on September 16, 2024, and has reviewed the

relevant provisions of the LC Statute, this Court's prior decisions concerning the

application of the LC Statute, and the current motion for injunctive relief.

## I.    BACKGROUND

### A.    The LC Statute

The LC Statute, codified at O.C.G.A § 21-5-34.2, became effective on July

1, 2021.  2021 Ga. Laws 219, eff. July 1, 2021.  The LC Statute provides for the

creation of leadership committees which "may accept contributions or make

expenditures for the purpose of affecting the outcome of any election or advocating

for the election or defeat of any candidate . . . ."  O.C.G.A. § 21-5-34.2(d).  A

"leadership committee" is defined as follows:

> [A] committee, corporation, or organization chaired by the Governor,
> the Lieutenant Governor, the nominee of a political party for Governor
> selected in a primary election in the year in which he or she is
> nominated, or the nominee of a political party for Lieutenant Governor
> selected in a primary election in the year in which he or she is
> nominated.  Such term shall also mean up to two political action
> committees designated by the majority caucus of the House of
> Representatives, the minority caucus of the House of Representatives,
> the majority caucus of the Senate, and the minority caucus of the
> Senate.  No person may chair more than one leadership committee.

O.C.G.A. § 21-5-34.2(a).[1]

---

[1] A "political party" is defined as any "political organization" which, at the
preceding gubernatorial election, nominated a candidate for Governor who "polled
at least 20 percent of the total vote cast in the state for Governor;" or which at the
preceding presidential election nominated a candidate for President who "polled at

A leadership committee may begin to accept contributions prior to being registered as such, but it must register with the Georgia Government Transparency and Campaign Finance Commission (the "Commission") within ten days of beginning to accept contributions, must disclose contributions or expenditures in excess of $500.00, and may accept contributions without monetary limitations:

> A leadership committee which accepts contributions or makes expenditures in excess of $500.00 shall register with the [C]ommission within ten days of such accepted contribution or such expenditure and, thereafter, shall file disclosure reports pursuant to the schedule defined for candidates and campaign committees in subsection (c) of Code Section 21-5-34. Such disclosure reports shall be made pursuant to subsection (b) of Code Section 21-5-34. . . . The contribution limits in Code Section 21-5-41 shall not apply to contributions to a leadership committee or expenditures made by a leadership committee in support of a candidate or a group of named candidates.

O.C.G.A. § 21-5-34.2(e). A leadership committee is considered "a separate legal entity from a candidate's campaign committee and shall not be considered an independent committee."[2] Id. § 21-5-34.2(f).

---

least 20 percent of the total vote cast in the nation for that office." O.C.G.A. § 21-2-2(25). Consequently, the only political parties in Georgia are the Democratic and Republican Parties.

[2] An "independent committee" is "any committee . . . other than a campaign committee, political party, or political action committee, which receives donations during a calendar year from persons who are members or supporters of the committee and which expends such funds either for the purpose of affecting the outcome of an election for any elected office or to advocate the election or defeat of any particular candidate." Id., § 21-5-3(15). An independent committee is able

The LC Statute changes the amount and manner in which campaign contributions were made prior to its enactment in two significant respects. First, those persons or entities that are authorized to establish a leadership committee are not subject to the contribution limits imposed upon candidates and their campaign committees. Under O.C.G.A. § 21-5-41(a) & (b), candidates and their campaign committees for statewide elected office and for the General Assembly are limited in the amounts they may receive depending upon the particular election cycle. These contribution limitations

> shall be raised or lowered [at the end of each gubernatorial election cycle] in increments of $100.00 by order of the [C]ommission pursuant to a consideration by the [C]ommission of inflation or deflation during such cycle or four-year period, as determined by the Consumer Price Index published by the Bureau of Labor Statistics of the United States Department of Labor, and such limitations shall apply until next revised by the [C]ommission.

---

to raise and expend funds to advocate for the defeat or election of a candidate for elective office without any limitation on the amount of contributions or expenditures, as long as the independent committee does not coordinate its activities with an individual candidate or a candidate's campaign committee. See Ga. Comp. R. & Regs. r. 189-6-04 ("Campaign contribution limits on contributions to candidates do not apply to independent expenditures made to influence candidate elections. An independent expenditure is an expenditure for a communication which expressly advocates the election or defeat of a clearly identified candidate but which is made independently or any candidate's campaign.").

O.C.G.A. § 21-5-41(k). The current contribution limits for candidates for statewide elected office are $8,400 for a primary and general election and $4,800 for a run-off, and for all other candidates are $3,300 for a primary and general election and $1,800 for a run-off. See GEORGIA GOVERNMENT TRANSPARENCY & CAMPAIGN FINANCE COMMISSION, www.ethics.ga.gov/contribution-limits (last visited Sept. 18, 2024).

Second, those persons and entities that are authorized to establish leadership committees are not subject to the prohibition on the acceptance of contributions by a statewide elected public officer or a member of the General Assembly during a legislative session. See O.C.G.A. § 21-5-35(a) ("No member of the General Assembly or that member's campaign committee or public officer elected state wide or campaign committee of such public officer shall seek or accept a contribution or a pledge of a contribution to the member, the member's campaign committee, or public officer elected state wide, or campaign committee of such public officer during a legislative session.").

### B.    Prior Challenges to the LC Statute

#### 1.    Perdue v. Kemp

On January 6, 2022, former United States Senator David Perdue and his campaign committee, Perdue for Governor (collectively, "Perdue"), filed a

complaint challenging the constitutionality of the LC Statute as applied because it permitted Governor Brian Kemp ("Governor Kemp"), as the sitting governor, to raise and spend unlimited funds through Georgians First Leadership Committee, Inc. ("Georgians First") in the Republican Party primary election for governor, while Perdue could raise only a maximum of $7,600[3] from an individual contributor for the same primary election. Perdue v. Kemp, 584 F. Supp. 3d 1310, 1316 (N.D. Ga. 2022). Initially, Perdue only named Governor Kemp, Attorney General Christopher M. Carr, and the individual members of the Commission as defendants, even though he was seeking to enjoin "the activity of any gubernatorial leadership committee established" under the LC Statute. Id. at 1320. Because the scope of any injunctive relief would be limited to Georgians First, which was not a party to the complaint, the Court granted Perdue time to file an amended complaint to add Georgians First as a party to the litigation. Id. at 1317.

On February 7, 2022, after Perdue added Georgians First as a defendant, this Court entered an Order finding that Perdue had standing to challenge the LC Statute because (1) Perdue alleged an injury in fact due to his inability to receive unlimited contributions in the same primary election in which his opponent,

---

[3] As noted above, the limit for candidates for statewide office has been raised by the Commission to $8,400 for a primary election.

Governor Kemp, was able to raise unlimited funds through Georgians First;
(2) Perdue's alleged injury was directly traceable to the unequal campaign finance
scheme of the LC Statute; and (3) the requested relief—to enjoin Georgians First
from making expenditures in favor of Governor Kemp in the primary election
against Perdue—would redress the alleged constitutional infirmity. Id. at 1318-20.

Having found that Perdue had standing, the Court also found that Perdue
satisfied all of the required factors to support a preliminary injunction. Id. at
1321-28. Specifically, with respect to the most important factor, likelihood to
succeed on the merits of his claim, the Court found that the LC Statute violated
Perdue's rights under the First Amendment because (1) the LC Statute effectively
negated the contribution limit imposed upon all candidates for Governor in the
primary election for just one candidate, Governor Kemp, through his leadership
committee, Georgians First; (2) the defendants failed to demonstrate a sufficiently
important state interest to support such a distinction; and (3) the statute was not
closely drawn to serve any such purported interest. Id. at 1326-27. The Court
preliminarily enjoined Georgians First

> from expending funds beginning on the date of this Order (1) for the
> purpose of advocating for the re-election of Governor Kemp or the
> defeat of an opponent of Governor Kemp through the 2022 primary
> election and 2022 primary runoff election, if any there be, or (2) to
> defray ordinary and necessary expenses incurred in connection with
> Governor Kemp's campaign for re-election as Governor of Georgia

7

though the 2022 primary election and 2022 primary runoff election, if
any there be, until further Order of this Court.

Id. at 1329.  The injunction did not prevent Georgians First from continuing to

receive funds and make expenditures "in support of public officials other than

Governor Kemp," nor did it make unlawful any expenditures made prior to the

Court's Order to promote Governor Kemp's re-election or the defeat of an

opponent of Governor Kemp.  Id.  The injunction also imposed no restrictions on

the members of the Commission or the Attorney General of Georgia.  Id.  Perdue

lost the 2022 Georgia gubernatorial primary to Governor Kemp and Perdue

voluntarily dismissed the case on February 6, 2023.  Plaintiffs' Notice of

Voluntary Dismissal, Perdue v. Kemp, No. 1:22-CV-0053-MHC (N.D. Ga. Feb. 6,

2023), ECF No. 84.

## 2.    One Georgia v. Carr

On March 21, 2022, Stacey Y. Abrams ("Abrams") and One Georgia, Inc.

("One Georgia"), a leadership committee chaired by Abrams, filed a lawsuit

against the Attorney General of Georgia and the members of the Commission

challenging the constitutionality of the LC Statute.  One Georgia, Inc. v. Carr, 599

F. Supp. 3d 1320, 1326 (N.D. Ga. 2022).  Specifically, the plaintiffs argued that

although One Georgia had raised funds, it was subject to the threat of enforcement

proceedings by the Commission should it make expenditures.  Id. at 1326-27.  In

8

addition, similar to the plaintiffs in <u>Perdue</u>, the plaintiffs in <u>One Georgia</u> contended

that the LC Statute permitted Governor Kemp, through Georgians First, to raise

unlimited contributions to benefit his candidacy for Governor, but Abrams was not

permitted to raise similar funds through One Georgia until after she was authorized

to do so following the Democratic Party primary election for Governor when she

would be the nominee. <u>Id.</u>

> However, rather than seek to have [the] Court restrict Governor Kemp's
> ability to continue to raise unlimited contributions through Georgians
> First until and unless he [wa]s selected in the primary election as the
> Republican Party's nominee for Governor, Plaintiffs instead [sought]
> to have [the] Court immunize One Georgia from administrative action
> by the Commission if One Georgia [continued] to raise funds as
> Abrams's leadership committee prior to the primary election. Indeed,
> Plaintiffs [sought] to have [the] Court preliminarily enjoin Defendants
> "from engaging in investigatory or enforcement proceedings or
> sanctioning Plaintiffs for alleged violation of the LC Statute" by
> operating One Georgia as a leadership committee.

<u>Id.</u> at 1327.

The Court found that Abrams and One Georgia alleged an injury in fact

based on the LC Statute's unequal finance scheme and that they did not have to

wait for the Commission's action to enforce the provisions of the LC Statute before

seeking relief. <u>Id.</u> at 1329-30. However, the Court also found that the requested

injunction, which would permit Abrams and One Georgia to raise unlimited funds

prior to her becoming the Democratic nominee for Governor, would not redress the

alleged injury because it "would do nothing to address Plaintiffs' allegations that the LC Statute unfairly allows Georgians First to raise unlimited contributions on behalf of Governor Kemp based solely on his status as Governor, and prior to his becoming the Republican Party nominee." Id. at 1330. The Court denied the motion for preliminary injunction because the relief sought would permit One Georgia to operate a leadership committee in violation of the state law that requires a nominee to be chosen in a primary and would permit One Georgia to undertake the very activity challenged in its lawsuit. Id.

Subsequently, Abrams and One Georgia amended their complaint to add Georgians First as a party defendant and, "[a]s an alternative to obtaining relief against the Commission's enforcement of the LC Statute against them," the plaintiffs modified the requested relief to enjoin Governor Kemp's leadership committee, Georgians First, "from soliciting or receiving contributions unless and until Governor Kemp becomes the Republican Party's nominee for Governor." One Georgia, Inc. v. Carr, 601 F. Supp. 3d 1291, 1301 (N.D. Ga. 2022), appeal dismissed as moot sub nom. One Georgia, Inc. v. Georgians First Leadership Comm., Inc., No. 22-11495-J, 2022 WL 16631279 (11th Cir. Aug. 2, 2022). Given that the plaintiffs sought new relief directed at Georgians First, the Court found that the plaintiffs had standing, and, like the plaintiffs in Perdue, were likely

to succeed on the merits of their claim that the LC Statute as applied was an impermissible infringement of their First Amendment rights. Id.

The Court enjoined Georgians First "from soliciting or receiving contributions until and unless Governor Brian Kemp becomes the Republican Party nominee for Governor of Georgia in the 2022 primary election or primary election runoff." Id. Once again, no relief was granted against either the members of the Commission or the Attorney General of Georgia. Id. Abrams lost the November 2022 election to Governor Kemp and the case was dismissed as moot on January 18, 2023. November 8, 2022: General/Special Election, Ga. Sec'y of State, https://perma.cc/NAW5-ETB3 (Nov. 21, 2022, 3:05 PM); Order, One Georgia, Inc. v. Carr, No. 1:22-CV-1130-MHC (Jan. 18, 2023), ECF No. 96.

### 3.    Graham v. Carr

On September 8, 2022, Ryan Graham, the Libertarian Party nominee for Lieutenant Governor, and the Libertarian Party of Georgia filed suit against the Attorney General of Georgia, the Commission, and the Chair of the Commission, challenging the constitutionality of the LC Statute as applied, alleging that it violated their free speech and equal protection rights under the First and Fourteenth Amendments. Graham v. Carr, 634 F. Supp. 3d 1343, 1350 (N.D. Ga. 2022). The plaintiffs in Graham alleged that the LC Statute permitted the Republican and

11

Democratic Parties' nominees for statewide office to establish leadership

committees (thereby allowing them to raise funds in unlimited amounts), but it did

not afford the same right to candidates of political bodies for statewide office, like

Graham, who are subject to contribution limits. Id.

More specifically, the plaintiffs alleged that, on June 17, 2022, Burt Jones

("Jones"), the Republican Party nominee for Lieutenant Governor, registered a

leadership committee called the "WBJ Leadership Committee, Inc.," which had

raised at least $60,000 in contributions that exceeded the contribution limits

prescribed by O.C.G.A. § 21-5-41. Id. Graham alleged that he "want[ed] to chair

a leadership committee for the purpose of supporting Libertarian candidates for

public office, including his own candidacy for Lieutenant Governor," and that he

"plan[ned] to run again as a Libertarian candidate for statewide public office in

future elections." Id. Graham sought a preliminary injunction that would either

(1) "prohibit the defendants from limiting leadership committees to the nominees

of 'political parties,'" or (2) "prohibit the defendants from enforcing the

[Leadership Committee Amendment] in its entirety." Id.

On October 6, 2022, the Court denied the motion for preliminary injunction.

Id. at 1357-58. The Court agreed that the plaintiffs had alleged an injury in fact for

the same reasons as did the plaintiffs in Perdue and One Georgia; namely, that

Graham was unable to raise funds in excess of the individual contribution limits in

O.C.G.A. § 21-5-41(a) while Jones, running for the same office, could do so

through his leadership committee. Id. at 1351-52. However, the Court found that

the plaintiffs failed to allege any injury traceable to the challenged action because

there was no allegation that any of the defendants were threatening to institute any

action against them. Id. at 1352. The Court further found that the redressability

requirement was not satisfied because, like the plaintiffs in the first iteration in One

Georgia, the plaintiffs wanted to raise unlimited funds without facing any

enforcement action from the Commission. Id. at 1352-54. The plaintiffs appealed

the order, but "on November 8, 2022, Graham lost the election for Lieutenant

Governor," and the Eleventh Circuit directed this Court to dismiss the appeal as

moot. Graham v. Att'y Gen., 110 F.4th 1239, 1244-46 (11th Cir. 2024).

## C.    The Current Complaint

Like the plaintiffs in Perdue, One Georgia, and Graham, the present lawsuit

challenges the constitutionality of the LC Statute on the ground that it violates

DPG's First and Fourteenth Amendment rights by creating an unequal campaign

finance scheme where some candidates can raise and spend funds that are not

subject to the individual contribution limits established by O.C.G.A. § 21-5-41(a),

while their opponents remain subject to those limits. Verified Compl. for

Declaratory and Injunctive Relief ("Compl.") [Doc. 1].  Specifically, DPG

contends that the LC Statute

> provides a select few incumbent politicians with the ability to avoid
> campaign finance restrictions by establishing and chairing so-called
> leadership committees.  That framework and process monetizes
> political cronyism to the benefit of the political allies of the incumbent
> Governor, Lieutenant Governor, and the leadership of the House and
> Senate Caucuses, and to the detriment of essentially everyone else:
> political challengers; anyone who dares to voice an opinion of
> opposition; anyone who becomes a political enemy of the very few who
> can raise unlimited campaign dollars; and, of course, the voting public.

Id. at 1-2.  DPG alleges that the LC statute is constitutionally infirm on its face and

"violates the constitutional rights of speech and association of Plaintiff, its

members, and its constituents." Id. at 2.

However, unlike the prior cases before this Court, DPG does not allege that

there is an upcoming primary or general election for which a specific candidate has

established a leadership committee under the LC Statute, thus enabling that

candidate to raise unlimited contributions while his or her opponent is unable to do

so and is bound by the state's monetary limitations on contributions prescribed by

O.C.G.A. § 21-5-41.  Nor is there an allegation as to a specific expenditure made

by Georgians First in support of a particular candidate for the Republican Party

running opposed by a Democratic Party candidate who does not have potential

access to another leadership committee's expenditures on that candidate's behalf.

14

The allegations in the Complaint only relate to the potential of Georgians First to make expenditures in support of certain Republican candidates and to defeat certain Democratic candidates running for seats in the General Assembly. <u>See</u> Compl. ¶¶ 41 (alleging that Governor Kemp, through Georgians First, "intend[s] to put a 'bullseye' on the back of specific elected Democratic officials and to aid his Republican allies."); 42 (indicating five Democratic incumbent "targets" of Georgians First); 43 (alleging that Georgians First may provide "hundreds of thousands of dollars" to defeat these five Democratic legislative incumbents); 44-45 (alleging that Georgians First may also provide "hundreds of thousands of dollars" to the Republican incumbents who will face Democratic challengers in the upcoming general election). Additionally, DPG alleges that the Democratic nominees for Governor and Lieutenant Governor in 2026 will not have access to funds of leadership committees and that, although Governor Kemp is ineligible to run for re-election in 2026, he may use the contributions made to Georgians First to support Republican candidates for Governor.[4] <u>Id.</u> ¶¶ 54-56.

---

[4] The Complaint also alleges that the current Lieutenant Governor, who is not named as a party to this lawsuit but also is term-limited, could do the same with respect to his leadership committee's funds. <u>Id.</u> ¶ 58.

DPG's injunctive relief requests throughout the Complaint and its motion for injunctive relief are inconsistent.  See Compl. ¶ 64 ("Plaintiff requests that this Court . . . enjoin the State[5] from enforcing the law."); id. at Prayer for Relief (asking the Court "[t]o issue preliminary and permanent injunctive relief to enjoin Defendant, his employees, agents, and successors in office from enforcing O.C.G.A. § 21-5-34.2."); Pl.'s Mot. at 1 (moving "for preliminary injunctive relief prohibiting the State of Georgia from enforcing [the LC Statute]."); id. at 25 (asking that the Court "enjoin further efforts under [the LC Statute's] guise."). The Complaint does not specify what the sought-after relief would look like in practical terms, and it is unclear to whom the relief should be directed.  In its reply in support of its motion for injunctive relief, DPG attempts to clarify the parameters of its requested relief:

> In practical terms, what Georgia's campaign finance law would look like should this Court grant Plaintiff's requested preliminary relief is the status quo ante, under which LCs are prospectively held to the same standards as every other campaign committee.  Should this Court further grant Plaintiff's requested permanent relief, the LC would cease to exist and their assets would be distributed according to law. O.C.G.A. § 21-5-33.

Pl.'s Reply in Opp'n to Def.'s Resp. to Pl.'s Mot. ("Pl.'s Reply") [Doc. 13] at 9 n.7.

---

[5] The State of Georgia is not a party to this action.

## II.    STANDING

Before considering the merits of DPG's substantive arguments, the Court

must determine whether DPG has standing to mount a facial challenge to the LC

Statute.

Article III of the United States Constitution expressly limits federal

jurisdiction to "cases and controversies" and does not permit federal courts to issue

advisory opinions. Miller v. F.C.C., 66 F.3d 1140, 1145 (11th Cir. 1995) (citing

Flast v. Cohen, 392 U.S. 83, 94-96 (1968)). "To have a case or controversy, a

litigant must establish that he [or she] has standing," United States v. Amodeo, 916

F.3d 967, 971 (11th Cir. 2019), which requires the litigant to show (1) an injury in

fact that (2) is fairly traceable to the challenged action of the defendant and (3) is

likely to be redressed by a favorable decision. Lujan v. Defs. of Wildlife, 504 U.S.

555, 560-61 (1992); Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1245 (11th

Cir. 2020). The three components form an "irreducible constitutional minimum."

Lujan, 504 U.S. at 560. "The party invoking federal jurisdiction bears the burden

of establishing these elements," which, at the initial pleading stage, may be

established based on "general factual allegations of injury." Id. at 561. "In

determining whether a plaintiff has established standing, we keep in mind the

Article III notion that federal courts may exercise power only in the last resort, and

as a necessity and when the dispute is one traditionally thought to be capable of resolution through the judicial process." Ga. State Conference of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999) (quotation and citation omitted).

**A.    Injury in Fact**

DPG argues that it has alleged an injury in fact based on an "initiative" launched by Governor Kemp through Georgians First that would, among other things, aid five Republican Party challengers in races against five incumbent Democratic Party members of the General Assembly.[6] Pl.'s Mot. at 6-7. DPG contends that, if the "initiative" is carried out through expenditures by Georgians First, DPG and those Democratic candidates "would have to spend more time and resources raising money to compete but ultimately will not be able to raise and spend as much money ahead of the November General Election as their opposition because they remain subject to campaign contribution limits." Id. at 7-8.

In response, Governor Kemp asserts that DPG has "failed to produce concrete evidence that [the LC Statute] is an imminent threat to [its] members." Def.'s Opp'n to Pl.' Mot. ("Def's Opp'n") [Doc. 9] at 8 (quoting City of South

---

[6] None of these individuals are parties to this lawsuit.

18

Miami v. Governor of Fla., 65 F.4th 631, 640 (11th Cir. 2023)).  Further, Governor

Kemp rejects the argument that any disadvantage experienced by DPG members as

a result of the money raised and potentially spent by Georgians First amounts to a

concrete injury because the Democratic candidates for the General Assembly have

the option of obtaining funds through the Democratic caucus leadership

committees in the House and Senate.  Id.  In reply, DPG contends that not all

Democratic candidates will have access to the funds controlled by the leadership

committees of the House and Senate Democratic Caucuses, which are not

controlled by DPG.  Pl.'s Reply at 3-4.

An injury in fact is "an invasion of a legally protected interest that is

sufficiently concrete and particularized rather than abstract and indefinite." Ga.

State Conference of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir.

1999).  When the injury alleged is a future injury, the injury must be "actual or

imminent, rather than conjectural or hypothetical." Muransky v. Godiva

Chocolatier, Inc., 979 F.3d 917, 925 (11th Cir. 2020).  "A 'concrete' injury must

be 'de facto'; that is, it must actually exist." Spokeo, Inc. v. Robins, 578 U.S. 330,

340 (2016) ("When we have used the adjective 'concrete,' we have meant to

convey the usual meaning of the term—'real,' and not 'abstract.'").

The allegations of injury in the Complaint center on the unequal campaign

contribution scheme created by the LC Statute and emphasize Governor Kemp's

use of Georgians First to raise and spend money on behalf of Republican

candidates.  Compl. ¶¶ 59-60; see also id. ¶ 91 (citing O.C.G.A. § 21-5-34.2(e))

(alleging that the DPG, "its constituents, and its members have suffered, are

suffering, and imminently will continue to suffer irreparable injury as a result of

the LC Law's discriminatory restrictions, that allow the chair of a leadership

committee to favor one candidate over another vying for the same seat by

providing unlimited expenditures on behalf of that candidate, expenditures that are

not subject to the individual contribution limits established by O.C.G.A. § 21-5-41,

while that candidate's opponent remains subject to those limits.").  DPG explains

the alleged harm as follows:

> Defendant KEMP's use of [Georgians First] to benefit his cadre of
> Republican allies to the detriment of their Democratic opponents (and
> some of their Republican opposition as well), who remain subject to the
> restrictions of Georgia's campaign finance law, has, is, and will
> continue to cause an ongoing First Amendment injury, the ability to
> express core political speech.
>
> The injury is concrete, particularized, and actual; it is not conjectural or
> hypothetical.

Id. ¶¶ 49-50; Pl.'s Mot. at 7-8.  DPG argues that this unequal campaign finance

scheme causes harm to it as well as to its members and constituents, which confers

standing to it in its own right and associational standing on behalf of its members and constituents.  Pl.'s Mot. at 8.

This Court finds that DPG has failed to allege any actual, imminent, concrete, and particularized harm imposed by the LC Statute that is not speculative, regardless of whether that alleged harm is associated with elections in 2024 or 2026.[7]  DPG's argument that it is "severely burden[ed]" by the "asymmetrical limits" of the LC Statute, id. at 14, is belied by the fact that it does not allege that the LC Statute treats DPG or its candidates any differently than the Georgia Republican Party or its candidates.  Neither DPG nor the Georgia Republican Party is authorized to establish a leadership committee or to raise money in excess of the campaign contribution limits set out in O.C.G.A § 21-5-41. In other words, DPG has not alleged a scenario where the Georgia Republican Party is able to raise and spend unlimited funds as a result of the LC Statute while DPG cannot do the same.[8]  Indeed, it is undisputed that there are four Democratic

---

[7] The absence of any alleged actual, imminent, concrete, and particularized harm is fatal to DPG's standing argument on behalf of itself as an organization, or associational standing on behalf of its members.  See Jacobson, 974 F.3d at 1249 (rejecting the argument that the Democratic National Committee established associational standing to challenge a statute where "it failed to identify any of its members, much less one who will be injured by the ballot statute.").

[8] DPG alleges that there are "individuals who wish to donate to individual Democratic candidates directly in excess of the applicable campaign contribution

legislative caucus leadership committees that are authorized to dispense funds in favor of Democratic legislative candidates, just as the Republican legislative caucuses can do for Republican candidates. <u>See</u> Decl. of Steven Knittel (July 29, 2024) [Doc. 9-1] ¶¶ 8-9, 12-13 (identifying the Georgia Blue PAC Inc., A Better Georgia Inc., Georgians for Abortion Rights, and Georgia Senate Majority Defense Fund). Non-candidate members of both political parties may also contribute to these respective leadership committees.

The fallacy in DPG's standing argument is illustrated by examining the Supreme Court's decision in <u>Davis v. Federal Election Commission</u>, 554 U.S. 724 (2008), the case upon which DPG bases its theory of liability. Compl. ¶¶ 60, 89-90, 104; Pl.'s Mot. at 6-8, 10-23. In <u>Davis</u>, the Supreme Court considered a challenge to a federal statute providing that when a self-financed candidate

---

limits or to expend amounts on behalf of an individual Democratic candidate in excess of the applicable campaign contribution limits in coordination with the candidate and that candidate's campaign committee." Compl. ¶ 37. However, DPG does not name any of them, nor does DPG allege that similarly situated individuals in the Georgia Republican Party asymmetrically benefit from the LC Statute and are able to contribute amounts in excess of the campaign contribution limits directly to Republican candidates. Similarly, DPG alleges that it, "in its own right, would like to expend amounts on behalf of an individual Democratic candidate in excess of the applicable campaign contribution limits in coordination with the candidate and that candidate's campaign committee." <u>Id.</u> ¶ 38. Again, DPG does not allege that the Georgia Republican Party is able to contribute amounts in excess of the campaign contribution limits directly to Republican candidates.

expends more than $350,000 in personal funds, a competing candidate may raise

three times the normal limit on contributions from individual donors. <u>Davis</u>, 554

U.S. at 729-32. The Supreme Court found that the unequal treatment afforded by

the statute to one candidate over his opponent in the same election was an injury

sufficient to confer standing for a First Amendment challenge:

> Section 319(a) would shortly burden [the plaintiff's] expenditure of
> personal funds by allowing his opponent to receive contributions on
> more favorable terms, and there was no indication that his opponent
> would forgo that opportunity. Indeed, the record at summary judgment
> indicated that most candidates who had the opportunity to receive
> expanded contributions had done so. In these circumstances, we
> conclude that Davis faced the requisite injury from § 319(a) when he
> filed suit and has standing to challenge that provision's asymmetrical
> contribution scheme.

<u>Id.</u>, 554 U.S. at 734-35. However, the key difference between this case and <u>Davis</u>

is that the asymmetry created by the statute at issue in <u>Davis</u> was between one

candidate and his opponent. There is no similar asymmetry alleged in this case

because DPG does not allege that the LC Statute puts its counterpart, the Georgia

Republican Party, at an asymmetrical advantage. The Georgia Republican Party is

subject to the same campaign finance restrictions as DPG in terms of campaign

contributions and expenditures. Similarly, as it relates to candidates for office, the

Complaint does not allege that any Democratic candidate is at an asymmetrical

disadvantage because that candidate's Republican opponent controls and uses a leadership committee to the Democratic candidate's detriment.

Instead, the Complaint alleges that Governor Kemp, through Georgians First, intends to donate to particular Republican candidates running for the General Assembly.  Compl. ¶¶ 46-50, 59-60.  The LC Statute does not prevent Democratic candidates for those same offices from accessing funds from any one of the four Democratic legislative caucus leadership committees.  That Governor Kemp may raise more funds through Georgians First than other Democratic legislative caucus leadership committees is not a legally justiciable harm.[9]  Moreover, DPG only alleges that Georgians First "intends" to donate to certain Republican candidates.  Compl. ¶ 41.  There is no allegation that any donation has been made to date.[10]  As

___

[9] The fact that one candidate for office may have the ability to access funding in excess of another party's candidate is more in the nature of a partisan preference rather than a constitutional violation.  See Jacobson, 974 F.3d at 1251 (denying injunctive relief as to the enforcement of a statute providing for the order in which a political party's candidates appear on the ballot, stating "[b]ecause that kind of harm from ballot order is based on nothing more than 'generalized partisan preferences,' it is insufficient to establish standing.").

[10] The Complaint lists five Democratic candidates for the Georgia General Assembly that DPG alleges Georgians First intends to target and six Republican candidates DPG alleges Georgians First intends to support.  Id. ¶ 42-45 (alleging that Kemp, through Georgians First, "has committed to provide, has provided, or will provide ahead of the November General Election, hundreds of thousands of

such, DPG's allegations of harm remain "conjectural" allegations and "fears of hypothetical future harm," which do not allege an imminent concrete injury sufficient to confer standing.  <u>Muransky</u>, 979 F.3d at 925-26.  The same is true for any supposed expenditures that may be made by Georgians First on behalf of Republican candidates for Governor in 2026.

The Court finds that DPG has failed to allege a concrete, particularized, actual, or imminent injury to confer standing in its own right or associational standing on behalf of its members related to the 2024 or 2026 election cycle.  The Eleventh Circuit has ruled that similarly speculative and conjectural allegations challenging the LC Statute do not present a live controversy:

> But even assuming, as [the plaintiffs] argue, that 'the current campaign-finance rules affect candidate recruitment and fundraising plans for future elections,' their complaint failed to allege anything related to the Libertarian Party's future campaigns.  We cannot merely rely, as Graham and the Libertarian Party urge in their briefing, on the fact that the Libertarian Party has run candidates in every election for Governor or Lieutenant Governor since 1990.  Without any concrete allegations about the Libertarian Party's intentions for future elections in the complaint itself, the case as presented to us fails to present a live controversy with respect to which the court can give meaningful relief.

---

dollars.").  Apart from this conclusory allegation, DPG does not allege that any specific campaign contribution has been made.

Graham, 110 F.4th at 1245 (internal quotation and citation omitted); see also

Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409-10 (2013) ("Although

imminence is concededly a somewhat elastic concept, it cannot be stretched

beyond its purpose, which is to ensure that the alleged injury is not too speculative

for Article III purposes—that the injury is certainly impending. . . . Thus, we have

repeatedly reiterated that threatened injury must be certainly impending to

constitute injury in fact, and that allegations of possible future injury are not

sufficient.") (internal punctuation and citation omitted).

### B.    Traceability

DPG's Complaint and Motion for Preliminary Injunctive Relief make the

identical single-sentence argument in support of its contention that the alleged

injury is traceable to actions by Governor Kemp: "The aforementioned injury in

fact is traceable to the inequitable framework (and altogether obvious plan) which

permits KEMP and the other chairs of leadership committees to raise funds not

subject to individual contribution limits established by O.C.G.A. § 21-5-41."

Compl. ¶ 62; Pl.'s Mot. at 9.  In response, Governor Kemp argues that he has no

enforcement authority under the LC Statute and there is no allegation that he has

threatened to enforce the LC Statute against DPG.  Def.'s Opp'n at 10-11.  DPG

maintains that its injury is traceable to Governor Kemp because "he is charged to enforce the laws of this state, including the [LC Statute]." Pl.'s Reply at 6-7.

In order to demonstrate traceability, DPG must show a causal connection between the asserted injury-in-fact and the challenged action of the defendant, and the causal connection cannot be too attenuated. Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1274 (11th Cir. 2001) (citing Lujan, 504 U.S. at 560); see also Graham, 634 F. Supp. 3d at 1352 (quoting Jacobson, 974 F.3d at 1253) ("To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.'").

In fact, the allegations of the Complaint make clear than DPG asserts that it is the "inequitable framework" created by the LC Statute that creates the DPG's alleged injury, not any action on the part of Governor Kemp either in his official capacity or through Georgians First. It is the Commission, not Governor Kemp, that would initiate an enforcement proceeding under the LC Statute, and there is no allegation that DPG intends to establish its own leadership committee in contravention of the statute that would subject it to any action by the Commission. Moreover, there is no allegation that any opponent of a Democratic Party candidate in an upcoming primary or election is able to solicit unlimited amounts of

contributions through that candidate's leadership committee while the Democratic candidate is not.  Compare One Georgia, 601 F. Supp. 3d at 1303 (finding an indirect harm traceable to the unequal finance scheme established by the LC Statute "flowing from the actions of Georgians First in continuing to solicit contributions prior to Governor Kemp's nomination as the Republican Party candidate for Governor while One Georgia is unable to do so.").

Because DPG has not alleged any injury that is traceable to any action of Governor Kemp, DPG has failed to establish traceability for purposes of standing.

## C.    Redressability

DPG must prove that there is a substantial likelihood that its injuries would be redressed by a favorable decision on the merits.  See Clapper, 568 U.S. at 410-14 (holding that it must be likely, not merely speculative, that the injury will be redressed by a favorable decision); Wooden, 247 F.3d at 1274 (holding that the plaintiff must show that it is likely rather than speculative that "the injury will be redressed by a favorable decision").

DPG alleges that Governor Kemp "is Georgia's chief law enforcement officer, with the constitutional responsibility to 'take care that the laws are faithfully executed,'" including the LC Statute.  Compl. ¶ 6 (quoting GA. CONST. art. V, § 2).  The DPG seeks "preliminary and permanent injunctive relief to enjoin

Defendant, his employees, agents, and successors in office from enforcing

O.C.G.A. § 21-5-34.2." Id., Prayer for Relief.  However, it is not Governor Kemp

but "[t]he Attorney General and the [Commission that] enforce the Campaign

Finance Act," which contains the LC Statute.  Graham, 110 F.4th at 1242, n.3

(citing O.C.G.A. § 21-5-6(b)(14)).

Because the only named Defendant in this case is not the person charged

with responsibility to enforce the challenged statute, DPG has failed to

demonstrate that a favorable decision is likely to redress any asserted injury.[11]

## III.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's Motion

for Preliminary Injunctive Relief [Doc. 2] is **DENIED**.

**IT IS SO ORDERED** this 19th day of September, 2024.

MARK H. COHEN
United States District Judge

---

[11] Because this Court concludes that DPG does not have standing, the Court should
not opine on the merits of DPG's Motion for Preliminary Injunctive Relief.  See
Jacobson, 974 F.3d at 1269 (finding error when a district court rules on the merits
of a case where the plaintiffs lack standing, because such a ruling only would be an
advisory opinion.).